545 A.2d 674

**Edith Anne ARROWSMITH et al.**

v.

**MERCANTILE–SAFE DEPOSIT AND TRUST COMPANY et al.**

No. 144, Sept. Term, 1987.

Court of Appeals of Maryland.

Aug. 8, 1988.

A. MacDonough Plant (Semmes, Bowen & Semmes, on brief), Baltimore, Stanard T. Klinefelter and Roger D. Redden (Robert C. Young and Kurt J. Fischer, on brief), Baltimore, William T. Kerr (John C. Heisler and Bregel, Kerr & Heisler, on brief), Towson, Scott M. Kleger (Ronald W. Fuchs, Edward J. Hutchins, Jr. and Eccleston and Seidler, on brief), Baltimore, for appellants/cross-appellees.

Frederick G. Savage (Estelle A. Fishbein, both on brief), Baltimore, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

This estates and trusts case presents three issues:

1. Where the exercise of a testamentary power of appointment is questioned under the rule against perpetuities, should the period of the rule be measured from the creation of the power, as provided by current Maryland law, or from the exercise of the power?

2. Can the doctrine of dependent relative revocation avoid the rule against perpetuities by including a perpetuities saving clause from an earlier exercise of a testamentary power of appointment into a later exercise of the power?

3. Should Maryland law be changed to recognize pledges to make charitable contributions as enforceable contracts where there is no consideration, including estoppel?

Because we shall not unsettle the settled law applied by the circuit court to issues one and three and because we agree with the circuit court's response in the negative on issue two, we shall affirm.

By an irrevocable deed of trust to Mercantile–Safe Deposit and Trust Company (Mercantile) of May 1, 1953, Frances Cook Arrowsmith (Frances) created in her son, George H.C. Arrowsmith (George), a testamentary power of appointment over assets valued at the time of the proceedings below at some $7 million. George married Molly Jackson in 1958. Three children were born of the marriage, Edith Anne in 1959, Jeffrey in 1961 and Stephen R. in 1962. George and Molly were divorced in 1965.

Apparently as a result of the divorce George executed a new will on April 15, 1966. That will was in terms revoked by the revocation clause of a will executed by George on December 30, 1976. The 1976 will was in terms revoked by the revocation clause of a will executed by George on July 29, 1982. The 1966, 1976 and 1982 testamentary instruments each undertake to exercise the power of appointment under the 1953 trust created by Frances. George died April 11, 1983, and the 1982 will was probated.

In item SECOND of his 1982 will, George appointed specific sums from the 1953 trust to specific charities and appointed the balance to a trust of which Mercantile and George's cousin, Francis N. Iglehart (Iglehart), were trustees. Iglehart prepared the 1976 and 1982 wills for George. The item SECOND trust provides $10,000 per year for George's former wife for her life or until she remarries. The balance of the corpus appointed from Frances's 1953 trust was to be held by George's trustees in equal shares for the children of George for their respective lives and thereafter each share was to be distributed per stirpes to the descendants of George's children. Income payable to the life beneficiaries was solely in the discretion of the trustees who also had a discretionary power to invade corpus.[1]

---

1. Item SECOND of the 1982 will in relevant part reads:
    SECOND: I hereby exercise the power of testamentary appointment which I possess under the Declaration of Trust dated May 1, 1953, from my mother, FRANCES COOK ARROWSMITH, to the SAFE

DEPOSIT AND TRUST COMPANY OF BALTIMORE (now MERCAN-TILE–SAFE DEPOSIT AND TRUST COMPANY) as Trustee, as follows:

A. ...

16. Whatever sum that may be required to fulfill any pledge that I may have made for the John Eager Howard Endowment Fund for the Division of Endocrinology of the Johns Hopkins University School of Medicine.

B. In order to implement an agreement entered into with my former wife, MOLLY JACKSON ARROWSMITH, dated September 25, 1972, and certain amendments thereto, I appoint free of trust to her the following sums to be paid by my Trustees, hereinafter named in the amounts and dates as indicated: Ten Thousand ($10,000.00) Dollars per year in equal quarterly installments of Two Thousand Five Hundred ($2,500.00) Dollars each on the first days of January, April, July, and October for life or until she remarries.

C. The balance of said trust estate shall be retained by said Trustees and divided into such number of equal shares so that there shall be one equal share for each child of mine who survives me, and one equal share for the descendants collectively, who survive me of each child of mine who predeceases me, and I appoint such shares, absolutely or in further trust, in accordance with the following terms and provisions:

1. Each share thus set apart for the descendants, collectively, who survive me of each child of mine who predeceases me shall be divided and distributed, per stirpes, among such descendants, absolutely and free of trust, subject to the provisions of ITEM FIFTH of this my Will.

2. Each share thus set apart for a child of mine who survives me shall be held in further trust by the Trustees in accordance with the following terms:

(a) My Trustees shall pay so much or all of the net income to such child or one or more of his or her descendants living from time to time in such proportions, equally or unequally, as the Trustee determines, even if all of such income is paid to or for the benefit of such child or a descendant of him or her to the exclusion of all others, and my Trustees shall accumulate all of the net income not so paid, if any, and shall add it to the principal of the trust at least annually accounting from the date of my death.

(b) Upon the death of such child, his or her share, shall be distributed, per stirpes, to the then living descendants of such child, subject to the provisions of ITEM FIFTH of this my Will. If such child dies leaves no descendant then living, the same shall be divided, per stirpes, among my other then living and the then living descendants of then deceased children of mine, the share for each then living child of mine to be added to his or her trust share under this my Will and the share of any other descendant to be paid to him or her, subject to the provisions of ITEM FIFTH.

[ (c) ] I authorize my Trustees, in their sole and absolute discretion, to make payments from the principal of such child's share to or for the benefit of such child and his or her descendants living from time to time for his, her or their proper support, maintenance, education, health and care. All payments thus made shall be a

Mercantile, as trustee of the 1953 trust, perceived that George's exercise of the power of appointment from Frances in favor of the item SECOND trust under his 1982 will might well violate the rule against perpetuities. Frances's 1953 declaration of trust provided that, in default of appointment by George at his death, the 1953 trust was to be distributed absolutely to George's children. Mercantile petitioned for instructions as to how it should distribute. None of George's children have children so that the circuit court appointed counsel to represent all unknown and unborn persons who might have an interest in the item SECOND trust (the Unknowns).

Edith Anne, Jeffrey and Stephen Arrowsmith, the children of George, submitted, and the circuit court agreed, that the appointment to the item SECOND trust violated the rule against perpetuities. Applying Maryland case law, the court measured the period of the rule from the creation of the power in 1953. The circuit judge concluded that the life estates were not vested because distributions to the life tenants were discretionary under the item SECOND trust, and that the shares of George's children would not vest in any Unknowns until the respective deaths of Edith Anne, Jeffrey and Stephen. Because none of George's children were living in 1953 George was the measuring life. Inasmuch as George's children might survive him by more than twenty-one years, vesting might be postponed beyond the period permitted by the rule. On a question not presented for review in this appeal, the circuit court also found that the power of appointment had secondarily been exercised under item THIRD of George's will, the provision which governed disposition of George's personal estate. On that analysis twenty percent of the 1953 trust corpus was validly appointed to certain charities named in item THIRD of George's 1982 will. Item THIRD appointed the remaining

---

general charge against the principal of such share, and my Trustees in exercising this discretion may, but need not consider the other sources of income and principal available to such child or his or [her] descendants.

eighty percent to the item SECOND trust, an exercise of the power which the circuit court held to be invalid. Consequently, the circuit court decreed that that eighty percent be distributed outright to Edith Anne, Jeffrey and Stephen pursuant to the default of appointment provision in the 1953 trust established by Frances.

█ Iglehart is one of the appellants. In his capacity as a co-trustee of the item SECOND trust he will suffer a reduction of commissions to the extent that the corpus of the 1953 trust is distributed by the trustees of that trust rather than placed in the item SECOND trust. Accordingly, Iglehart has standing to question whether George's exercise of the power of appointment violates the rule against perpetuities. Iglehart argued before the circuit court that the exercise of the power by George under his will should mark the beginning of the period with which the rule against perpetuities is concerned here. The trial court measured the period from the creation of the power in 1953. Iglehart appeals that holding.

The Unknowns did not question the basics of the operation of the rule against perpetuities but argued that under the particular facts of this case the rule has no application. In his 1966 will George had appointed the corpus of the 1953 trust in further trust for the lives of his children to whom he gave powers of further testamentary appointment, and, on default of appointment, he gave absolutely to their descendants. But George had limited the duration of the trust under his 1966 will to the lifetime of the last survivor of eleven specifically identified persons, all of whom were alive when the 1953 trust was created. This provision might also have operated to terminate the testamentary trust for George's children before the maximum period permitted under the rule against perpetuities. Apparently for that reason, and perhaps others, the perpetuities saving clause was not included in the 1976 and 1982 wills of George. The Unknowns contended that the circuit court should bring the 1966 saving provision forward into the 1982 will and that the doctrine of dependent relative

revocation authorized that court, in effect, to cut and paste the various wills of George in the manner requested. The circuit court held that it could not save an appointment to the item SECOND trust from the perpetuities violation by applying dependent relative revocation. The Unknowns appeal from that holding.

A third issue has been briefed and argued on appeal because counsel for Edith Anne and Stephen are of the view that this case presents an appropriate vehicle for changing the Maryland law of contracts by holding that pledges to contribute to charity are per se enforceable. In *Maryland Nat'l Bank v. United Jewish Appeal Fed'n*, 286 Md. 274, 407 A.2d 1130 (1979), we required legal consideration, at least by way of estoppel, for contractual enforceability of those pledges despite a contention that courts should enforce those pledges as contracts because it would be good public policy to do so. In the instant case the circuit court necessarily rejected the merits of the same public policy argument. From that holding Edith Anne and Stephen appeal.

We granted a joint petition for certiorari prior to consideration of these appeals by the Court of Special Appeals.

I

■■ The circuit court properly pinpointed the pertinent period for perpetuities purposes. It commenced with the execution of the 1953 deed of trust. Judge Oppenheimer, writing for this Court in *Murphy v. Mercantile–Safe Deposit & Trust Co.*, 236 Md. 282, 287, 203 A.2d 889, 892 (1964), restated the Maryland law:

Under our decisions, the provisions of a will exercising a testamentary power of appointment given under a deed of trust must be considered as if contained in the deed of trust in determining whether or not the appointment violates the rule against perpetuities. The period of the Rule is calculated from the date of the deed of trust creating the power and not from the exercise of the power by the will. *Gambrill v. Gambrill*, 122 Md. 563,

89 Atl. 1094 (1914); *Hawkins v. Ghent,* [154 Md. 261, 140 Atl. 212 (1928)]; *Ryan v. Ward,* [192 Md. 342, 64 A.2d 258 (1949)]; *Fitzpatrick v. Mercantile–Safe Deposit & Trust Co.,* 220 Md. 534, 155 A.2d 702 (1959).

Iglehart's argument begins by recognizing that

> in determining the validity of interests created by the donee in the exercise of a general power presently exercisable, the courts have usually computed the period (for the purposes of the requirement of vesting under the rule against perpetuities) from the time of the exercise of the power by the donee rather than the time of its creation by the donor. [Jones, *The Rule Against Perpetuities as Applied to Powers of Appointment in Maryland,* 18 Md.L.Rev. 93, 101 (1958) (footnote omitted).]

Under Frances's 1953 trust the power of appointment is, however, restricted in that George had no power to appoint "to or for the benefit of himself, or his estate, or his creditors, or the creditors of his estate." Iglehart submits that the number of persons to whom, or for whose benefit, George could appoint without violating the quoted restriction is so great that this Court, as a matter of policy, should apply the same beginning point to this testamentary power as is applied to general powers presently exercisable. He points out that the quoted restriction on exercise of the power does no more than express the restriction which would be implied by law to an otherwise unqualified power. *See Balls v. Dampman,* 69 Md. 390, 16 A. 16 (1888). Indeed, the United States Court of Appeals for the Fourth Circuit has described "a Maryland 'general' power" as what would be termed "a special power elsewhere." *Martin v. United States,* 780 F.2d 1147, 1148 (1986).

This argument focuses exclusively on the scope of eligible beneficiaries under the power and ignores the fact that the power was not presently exercisable. We agree with the following evaluation by Professor Jones:

> When the application of the rule against perpetuities is involved, the courts have usually applied the "relation back" theory and viewed the appointment by the donee as

if it were a part of the instrument by which the donor created the power. This, in effect, requires that all interests created by the donee in the exercise of the power must be so limited that they are certain to vest within the period allowed by the rule counting from the time the donor created the power. Applied to testamentary powers, either general or special, or to special powers, either presently exercisable or testamentary, this rule seems sound since in all such cases the creation of the power by the donor has placed a clog on the title which cannot be removed until the donee exercises the power; the creation of the power thus ties up the property within the policy of the rule against perpetuities. [Jones, *supra,* at 101 (footnotes omitted).]

Further, and not without significant weight in our decision, is the fact that the law relating to the rule against perpetuities in Maryland is presently sufficiently complex. It will require stronger reasons than presented here for this Court to add to the complexity by altering an established aspect of the rule on which the bar must rely in estate planning.

## II

██ The Unknowns seek the same objective as Iglehart but through the doctrine of dependent relative revocation. No reported Maryland appellate decision has ever applied it. In 2 W. Bowe & D. Parker, *Page on the Law of Wills* § 21.57, at 446 (rev. ed. 1980), the authors describe the doctrine as operating in general

to invalidate the revocation of a will where it is shown that the revocation was conditioned on the occurrence of certain facts which never came to pass or upon the existence or nonexistence of circumstances which were either absent or present contrary to the condition. The courts very frequently apply the same doctrine where the revocation is carried out because of a purely mistaken frame of mind rather than a conditional frame of mind; but the courts still persist in calling it a conditional

revocation. The end result in this type of case is perhaps proper, but it would be much better to recognize it for what it is, a mistake, and then proceed to formulate the proper rule. A mistaken frame of mind is really quite different from a conditional frame of mind, and it involves a needless and highly fictional process to pretend that an act unconditionally done by a person who never doubts the truth of the erroneous beliefs which motivate him is in reality done conditionally.

Before reviewing those judicial decisions on which the Unknowns rely for application of the doctrine here, we set forth a statutorily based argument which Edith Anne and Stephen Arrowsmith advance but which we need not decide in this case.

Md. Code (1974), § 4-105(a) of the Estates and Trusts Article (ET) reads in part as follows:

A will, or any part of it, may not be revoked in a manner other than as provided in this section.

(a) *Subsequent will.*—By provision in a subsequent, validly executed will which (1) revokes any prior will or part of it either expressly or by necessary implication, or (2) expressly republishes an earlier will that had been revoked by an intermediate will but is still in existence

. . . .

ET § 4-106 provides:

If a testator makes a subsequent will intended to revoke a prior will, the destruction or other revocation of the subsequent will does not revive the prior will unless the will is still in existence and is republished with the same formalities as are required for the execution of a will in this subtitle.

Without regard to the effect, if any, that dependent relative revocation may have on wills revoked in Maryland by act to the document, *e.g.,* by burning, cancelling, tearing or obliterating the same, Edith Anne and Stephen submit that ET §§ 4-105 and 4-106 block utilization of the perpetuities saving clause from George's 1966 will because the 1966 and

1976 wills were revoked by express and, in terms, unconditional, revocation clauses in later wills with no republication of the saving clause as required by §§ 4–105(a)(2) and 4–106. We shall assume, *arguendo*, that revocation within the meaning of §§ 4–105(a) and 4–106 does not include an expressly conditional revocation so long as the condition remains unsatisfied. We shall further assume that an impliedly conditional revocation, even if the condition is a legal fiction based on mistake, similarly would not revoke a prior will within the meaning of the above-quoted statutes, so long as the implied condition remains unfulfilled.[2]

As reflected in the decisions relied upon by the Unknowns, even those courts which recognize the doctrine have not applied it in the manner requested by the Unknowns. Plucking the perpetuities saving clause from the 1966 will and inserting it in the 1982 will is inconsistent with the theoretical justification for the doctrine.

Warren, *Dependent Relative Revocation,* 33 Harv.L.Rev. 337, 343 (1920) refers to *Onions v. Tyrer,* 1 P.Wms. 343, 2 Vern. 741 (1717) as "undoubtedly the most celebrated case of dependent relative revocation." The testator's earlier will devised realty to trustees. A later will, containing a revocation clause, devised the same land to different trustees on the same uses. Under the law at that time the formality with which the second will was executed was

---

**2.** At oral argument in this Court counsel for Edith Anne and Stephen submitted an argument based on two other statutes. ET § 5–304(b) (1987 Supp.) provides that "[a]n administrative probate may be set aside and a proceeding for judicial probate instituted if, following a request by an interested person within 18 months of the death of decedent, the court" makes certain findings. ET § 5–407 provides that "[a] judicial probate may be reopened and a new proceeding held if, following a request by an interested person within 18 months from the death of the decedent, the court" makes certain findings. The argument is that these two statutes bar any recognition of a nonprobated will more than eighteen months after the death of the decedent and thus bar use of the perpetuities saving provision from George's 1966 will. This argument was not made to the circuit court and was not included in the appellate briefs. For these reasons we decline to decide that issue. *See* Md. Rule 8–131(a), 14 Md. Reg. 26 (Dec. 18, 1987).

sufficient for a revocation but insufficient to devise realty. The chancellor "was of opinion, that the former will stood good; for the latter will being void, and not operating as a will, would not amount to a revocation...." *Id.*, 2 Vern. at 742. To Warren the result appears correct because the two wills were so much alike that, had the testator known of the true legal situation, he would have preferred the first will to an intestacy. *Warren, supra,* at 343–44.

The Unknowns rely on another English decision which has been cited by American courts, *In re Bernard's Settlement,* 1 Ch. 552 (1916). The donee of a power of appointment under a marriage settlement had by will exercised the power by appointing the corpus in trust to be held in equal shares for each of her six daughters until the earlier of the daughter's marriage or attaining age twenty-one at which time each daughter was to take outright. By a codicil the donee provided that the trust share for one particular daughter would, instead, be held for that daughter's lifetime, with a gift over. This modification violated the rule against perpetuities. It seemed obvious to the chancellor that "the intention of the testatrix is only to revoke the previous appointment for the purpose of giving effect to the increased security which she thought her daughter would have by the protecting clauses that she has added in the codicil." *Id.* at 561. He could not conclude "that the testatrix intended to revoke her bounty under her previous appointment in all respects...." *Id.* Accordingly, the court held that "the original appointment made by the will remains operative." *Id.*

The American decisions are similar. Justice Traynor considered the doctrine in a case involving a New Yorker who had moved to California. Under a will executed in New York and naming a New York resident as executor, the testator gave specific cash bequests to individuals and the residue of his estate to a church. Anticipating that his New York executor would not qualify in California, the testator executed a California will which revoked all prior wills and changed the executor but made the same gifts.

Three days later the testator died, thereby triggering a California mortmain statute which invalidated the bequest to the church. The Supreme Court of California applied dependent relative revocation. *In re Kaufman's Estate*, 25 Cal.2d 854, 155 P.2d 831 (1945). It reasoned as follows:

The record makes clear the intention of the testator. He did not change his testamentary purpose but only minor details in its execution. The five cash legacies with residue to appellant church constituted the whole of his unaltered testamentary purpose. Since the second will was virtually identical with the first in the disposition of the testator's estate, it is clear that the first will was revoked only because the second duplicated its purpose and that *the testator would have preferred the first will to intestacy as to a substantial part of his estate.* When a testator repeats the same dispositive plan in a new will, revocation of the old one by the new is deemed inseparably related to and dependent upon the legal effectiveness of the new. [*Id.* at 860, 155 P.2d at 834 (citations omitted; emphasis added).][3]

We have also been referred to *Charleston Library Soc'y v. Citizens & S. Nat'l Bank*, 200 S.C. 96, 20 S.E.2d 623 (1942). Miss Mary Jane Ross, late of Charleston, was "a lady of large means ... and ... doubtless a person of much culture and refinement." *Id.* at 98, 20 S.E.2d at 624. By an 1892 will she devised the family homestead for use as a branch of the Charleston Library and she created an endowment fund for its maintenance. By a 1921 codicil the testatrix expressly revoked the clause providing for the library and instead sought to create a trust for a museum housing her art collection. That gift failed under the rule against perpetuities because the collection was not of museum quality so that the trust was not a charitable one.

---

**3.** The appellate court's mandate directed that the New York will be admitted to probate with the California will which had previously been probated. The opinion does not explain to what extent, if any, the California will would be given effect in further proceedings.

When the Library Society claimed the bequests in opposition to residuary legatees, the court applied dependent relative revocation to sustain the overruling of a demurrer, saying:

> The codicil of 1921 should be regarded as a dependent relative revocation, or conditional revocation. The substituted provision for the museum having failed, the original provision for the Library becomes restored to full force and effect, in so far as the demurrer is concerned. [*Id.* at 126, 20 S.E.2d at 635.]

To the same effect see *Blackford v. Anderson*, 226 Iowa 1138, 1157, 286 N.W. 735, 746 (1939) ("The basis for the doctrine ... is that there was never any revocation of the earlier instrument, or real intention to revoke, because of a mental misconception of the effect of his act, on account of mistake, or ignorance, or some other error."); *LaCroix v. Senecal*, 140 Conn. 311, 317–18, 99 A.2d 115, 118 (1953) ("[W]hen it developed that the gift under the codicil to the defendant Aurea was void, the conditional intention of the testatrix to revoke the will was rendered inoperative, and the gift to Aurea under the will continued in effect.").

These cases demonstrate that the doctrine's underlying theory of conditional revocation limits the relief which a court can grant. If a later will which expressly revokes earlier wills itself fails in whole or in part, the doctrine requires a court to decide whether the decedent would have preferred the prior will to the result under the later will, which may be partial invalidity or intestacy. If a codicil which expressly revokes part of a will itself fails in whole or in part, the doctrine requires a court to decide whether the decedent would have preferred the unmodified will to the result under the invalid codicil. If the court is satisfied that the decedent would have preferred the earlier disposition to the result under the later invalid disposition, the revocation of the earlier is considered to be conditional on the validity of the later. Because the condition is not

satisfied, the earlier disposition remains operative.[4]

Expressed in terms of the facts in the present case, a more typical and, we believe, proper application of dependent relative revocation would require the circuit court to have found that George preferred the disposition under his 1976 will to that under the partially invalid 1982 will so that the 1976 will was never unconditionally revoked. If the process stopped at that step, the 1976 will would be considered to be the one in effect. That will, however, exercises an appointment of the 1953 trust corpus to a trust the terms of which are substantially those of the item SECOND trust in the 1982 will and, accordingly, that exercise of the power of appointment suffers the same invalidity as the

---

**4.** *In re Jones,* 352 So.2d 1182 (Fla.Dist.Ct.App.1977), cited by the Unknowns, does not fit the foregoing analysis. The testatrix in a 1965 will had disinherited her daughter and left her residuary estate to specified charities. A 1969 will revoked all prior wills and left the residue to an invalid charitable trust which violated the rule against perpetuities. The court said that "the residuary clause of the 1965 will along with the valid provisions of the 1969 will may be probated together so as to effectuate the decedent's testamentary intent." *Id.* at 1184. We are not persuaded by this analysis.

*Linkins v. Protestant Episcopal Cathedral Found.,* 187 F.2d 357 (D.C.Cir.1950) is unclear. It involved a series of three wills, one in 1943, a second of March 11, 1947 and a third of July 14, 1947. The July 14 will contained an express revocation of all prior wills. All three wills made the same disposition of the residual estate, fifty percent of which was given to religious institutions. Because the testatrix died within twelve days of the July 14 will, a District of Columbia mortmain statute voided the gifts made under the July 14 will to the religious institutions. The appellate court affirmed an application of dependent relative revocation under which the trial court had admitted both the July 14 and March 11 wills to probate and declared the March 11 will "to be effective in so far as it applied to the residual disposition" to the religious entities. *Id.* at 358. That order, if read literally, takes part of the residuary clause from the totally, but conditionally, revoked earlier will and inserts it into the later will. On the other hand the appellate court stated that the proof had obviously established "that testatrix executed the revocatory clause in her new will with the full intent that it not be effective until the new devise became effective." *Id.* at 360. Under this analysis the earlier will would remain effective in its entirety until the "cooling off" period under the mortmain statute had expired, *i.e.,* until the implied condition of revocation had been satisfied.

appointment in the 1982 will. If asked to do so by the Unknowns, the circuit court would next need to have considered whether, and found that, George would have preferred the disposition under the 1966 will to that under the partially invalid 1976 will. Had the Unknowns successfully cleared each of these hurdles, the appropriate remedy would have been to probate the 1966 will in its entirety.

Instead, the Unknowns ask that the perpetuities saving clause in the 1966 will be inserted into the 1982 will in order to save the exercise of the power. But this Court is neither empowered to write a will for George nor structure a will that differs from any will which George ever executed. The doctrine of dependent relative revocation does not present a court with a menu. It is not the judicial function to select some provisions from column A and some provisions from column B in order to put together a valid will.

Another way of expressing the same concept is to say that the Unknowns' argument is too narrow. It assumes that the issue is whether George would have preferred a valid appointment to the item SECOND trust of the 1982 will over an invalid exercise of the power. Within that framework the compelling inference is that he would want the expressed intention in his latest will carried out. But that does not mean that a court may take the saving clause from a will executed sixteen years earlier and write it into the latest will. Each successive will executed by George contained a clause which in terms revoked every prior will in its entirety. If dependent relative revocation operates here at all, it conditions the apparent total revocation of an earlier instrument and it implicitly conditions all of the later instrument's testamentary provisions as well.

When the comparison in this case is enlarged to include all of the provisions of the theoretically competing wills, it becomes clear why the argument presented on behalf of the Unknowns seeks only to insert the saving clause into the 1982 will. For the sake of simplicity we shall compare the 1982 will with the 1966 will and omit the step of the 1976 will. In the 1966 will George appointed from the 1953 trust

$5,000 to each of sixteen individuals, none of whom take under the 1982 will. The 1982 will appoints monetary gifts to sixteen eleemosynary organizations, only two of which were beneficiaries of the appointment in the 1966 will. In 1966 George made no provision for his former wife. In 1982 he appointed $10,000 per year to her.[5] In 1966 George made no absolute bequests to charity from his personal estate but in 1982 twenty percent of his estate was bequeathed to charity.[6] In 1966 Mercantile was the sole personal representative and trustee whereas in 1982 those responsibilities are shared with Iglehart.

These substantial differences between the wills prevent ruling that the 1966 will was only conditionally revoked by the 1982 will, even if it were conditionally revoked by the 1976 will. Thus the argument was made here to have the doctrine of dependent relative revocation run in a direction opposite to that reflected by most of the cases reviewed above. We have declined to do that. Therefore the circuit court was correct in rejecting the requested relief.[7]

## III

■ In his 1982 will George had appointed from Frances's 1953 trust to Johns Hopkins University (JHU) an amount equal to whatever the unpaid balance might be on a pledge which George had made to JHU. *See* n. 1 (Item SECOND, ¶ A, subparagraph 16). Edith Anne and Stephen

---

5. Because of an existing separation agreement, the circuit court held that $5,000 per year of this gift was invalid as an appointment to a creditor.

6. Under the 1966 will, if the perpetuities saving clause caused property to mature for distribution when there was no person then living who qualified to take, the distribution was to the Community Chest of the Baltimore Area, Inc.

7. This disposition makes it unnecessary for us to decide the extent to which evidence outside of the 1982, 1976 and 1966 wills may properly be considered as bearing on what George would have done had George known that an appointment to the item SECOND trust could not be carried out.

Arrowsmith contend that the pledge should be recognized as a contract, that the appointment of the balance to JHU, as an appointment to a creditor, is void for violation of the restriction in the 1953 trust and that the balance is properly payable to JHU out of George's probate estate as a debt due by the decedent.

To accept the above analysis requires that we overrule *Maryland Nat'l Bank v. United Jewish Appeal Fed'n, supra,* 286 Md. 274, 407 A.2d 1130 (1979). There an orphans' court allowed against a decedent's estate a creditor's claim filed by a charity based on an unfulfilled promise to contribute money. The case was contested and a factual record was made. On the personal representatives' appeal this Court reversed for want of consideration. We quote from *United Jewish Appeal* its recital of potential forms of consideration which were not present in that case:

When the facts concerning the charitable subscription of Polinger are viewed in light of the Maryland law, it is manifest that his promise was not legally enforceable. There was no consideration as required by contract law.... The consideration recited by the pledge card was "the obligation incurred based upon this pledge...." But there was no legal obligation incurred in the circumstances. Polinger's pledge was not made in consideration of the pledges of others, and there was no evidence that others in fact made pledges in consideration of Polinger's pledge. No release was given or binding agreement made by the UJA on the strength of Polinger's pledge. The pledge was not for a specific enterprise; it was to the UJA generally and to the Israel Emergency Fund. With respect to the former, no allocation by UJA to its beneficiary organization was threatened or thwarted by the failure to collect the Polinger pledge in its entirety, and, with respect to the latter, UJA practice was to pay over to the Fund only what it actually collected, not what was pledged. UJA borrowed no money on the faith and credit of the pledge. The pledge prompted no "action or forbearance of a definite and substantial character" on the

part of UJA. No action was taken by UJA on the strength of the pledge that could reasonably be termed "definite and substantial" from which it should be held harmless. There was no change shown in the position of UJA made in reliance on the subscription which resulted in an economic loss, and, in fact, there was no such loss demonstrated. UJA was able to fulfill all of its allocations. Polinger's pledge was utilized as a means to obtain substantial pledges from others. But this was a technique employed to raise money. It did not supply a legal consideration to Polinger's pledge. On the facts of this case, it does not appear that injustice can be avoided only by enforcement of the promise. [*Id.* at 289–90, 407 A.2d at 1138 (footnote omitted).]

In *United Jewish Appeal* we reviewed *Gittings v. Mayhew*, 6 Md. 113 (1854); *Erdman v. Trustees of the Eutaw Methodist Protestant Church*, 129 Md. 595, 99 A. 793 (1917); *Sterling v. Cushwa & Sons*, 170 Md. 226, 183 A. 593 (1936); and *American Univ. v. Collings*, 190 Md. 688, 59 A.2d 333 (1948) and concluded that Maryland law required at least reliance under the rule set out in § 90 of the Restatement of Contracts (1932).[8] We considered decisions from other states which enforce on public policy grounds purely gratuitous promises if they are charitable subscriptions. *See Salsbury v. Northwestern Bell Tel. Co.*, 221 N.W.2d 609 (Iowa 1974); *More Game Birds in America, Inc. v. Boettger*, 125 N.J.L. 97, 14 A.2d 778 (1940). We set forth Tentative Draft No. 2 of April 30, 1965, of the Restatement (Second) of Contracts, § 90 which read:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action

---

**8.** Restatement of Contracts § 90 (1932) expressed the following rule: A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

We nevertheless were unpersuaded that this Court should create an enforceable agreement which was unknown to established contract law, and we invited change by way of legislative enactment if a preferred status were to be bestowed upon charitable organizations. 286 Md. at 285, 470 A.2d at 1136. Thus, we are again asked to declare that a bare promise to pay something of value in the future creates an enforceable contract if the promisee is a charity.

Edith Anne and Stephen submit that we should now recognize the rule found in Restatement (Second) of Contracts § 90(2) as officially adopted by the American Law Institute on May 17, 1979, some five months before our opinion in *United Jewish Appeal* was filed. In the official version of § 90 the above-quoted paragraph from Tentative Draft No. 2 is subsection (1) and there is a subsection (2) which reads:

A charitable subscription or a marriage settlement is binding under Subsection (1) without proof that the promise induced action or forbearance.

In support of the change of Maryland law it is argued that (1) the change would be beneficial in the administration of decedents' estates because of a position peculiar to Maryland allegedly taken by the Internal Revenue Service based upon the *United Jewish Appeal* decision; and (2) this Court misperceived the state of the common law generally in *United Jewish Appeal.*

This case is not an appropriate vehicle for overruling *United Jewish Appeal.* The issue is not presented to us in a contested proceeding. JHU has not claimed against George's estate as a creditor and the trustee of the 1953 trust has not refused to honor the appointment to JHU. In its brief in this Court, JHU joins in urging the overruling of *United Jewish Appeal.*

It is apparent that the real adversary in this case is a nonparty, the Internal Revenue Service. One of the Internal Revenue Service Regulations relating to the federal estate tax is 26 C.F.R. § 20.2053–5 (1987) which reads:

> A pledge or a subscription, evidenced by a promissory note or otherwise, even though enforceable against the estate, is deductible [from the decedent's gross estate] only to the extent that—
>
> (a) Liability therefore was contracted bona fide and for an adequate and full consideration in cash or its equivalent, or
>
> (b) It would have constituted an allowable deduction under section 2055 (relating to charitable, etc., deductions) if it had been a bequest.

Counsel represent to us that, as a result of *United Jewish Appeal*, "the Internal Revenue Service does *not* permit Maryland personal representatives to deduct purely gratuitous charitable subscriptions paid by the personal representative." Brief of Appellants, Edith Anne and Stephen R. Arrowsmith, at 15–16. Rather than challenge the Service's interpretation of the regulation in a direct proceeding with the Service as adversary, counsel seek a change in Maryland law.

One principal effect of the requested change would be to subject Maryland citizens who make a generous pledge but who then face a change for the worse in economic circumstances to suits by charities on unfulfilled subscriptions. The ramifications of the requested change certainly extend beyond the possible federal tax savings where the personal representative elects to satisfy a written charitable pledge of the decedent. *Cf.* ET § 7–401(g) (authorization to satisfy written pledges). Absent having the requested change subjected to scrutiny by an adversary, we are unwilling judicially to change the law in a vacuum. *United Jewish Appeal* invited legislative consideration of its holding, but the General Assembly has not accepted that invitation. Moreover, the legislative process is more finely and continu-

ously attuned for the societal fact-finding and evaluating required for resolution of this exclusively public policy-based argument.

Nor are we in the least persuaded by the argument that this Court decided *United Jewish Appeal* under a misapprehension of the general state of the law at the time. The opinion does indeed contain a factual error in that, speaking on November 6, 1979, we said that Tentative Draft No. 2 of the Restatement (Second) of Contracts "has not been adopted by the American Law Institute," 286 Md. at 287, 407 A.2d at 1137, whereas in fact that Restatement had been adopted the preceding May. The significant point for present purposes, however, is that we fully considered the same arguments now presented. Comment *c* to § 90 in Tentative Draft No. 2 addressed *"Charitable subscriptions, marriage settlements, and other gifts."* It summarized the case law by saying that "American courts have traditionally favored charitable subscriptions and marriage settlements, and have found consideration in many cases where the element of exchange was doubtful or non-existent." *Id.* at 167–68. *United Jewish Appeal* fully recognized that some courts, on a pure public policy basis, enforced charitable subscriptions, but this Court would not carve out an exception to the established law of contracts in order to give a privileged position to promises made to charities. That is what Restatement (Second) of Contracts § 90(2) does.

For these reasons we reaffirm *United Jewish Appeal.*

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID ONE-THIRD BY MERCANTILE–SAFE DEPOSIT AND TRUST COMPANY AS TRUSTEE UNDER THE DEED OF TRUST OF FRANCES COOK ARROWSMITH OF MAY 1, 1953; ONE–THIRD BY APPELLANT, FRANCIS N. IGLEHART, AND ONE–THIRD BY APPELLANTS, EDITH ANNE AND STEPHEN R. ARROWSMITH.