705 A.2d 716

Henry J. KROLL

v.

Kenneth NEHMER.

No. 53, Sept. Term, 1997.

Court of Appeals of Maryland.

Feb. 11, 1998.

Alfred E. Clasing, III (Cannoles and Clasing, Chartered, on brief), Baltimore, for appellant.

Brice Dowell, Towson, for appellee.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, J. (Retired, Specially Assigned).

WILNER, Judge.

Margaret Binco died on December 19, 1994, leaving four wills—one dated July 24, 1980, a second dated April 12, 1985, a third dated June 28, 1990, and a fourth dated October 27, 1994. We are concerned here only with the second will—the 1985 will.

The 1980 will, it appears, had been altered, and, although it was at one time offered for probate, no one now contends that

it has any validity. When Ms. Binco drew the 1990 will, she wrote on the back of her 1985 will "VOID—NEW WILL DRAWN UP 6–28–90." [1] The 1990 and 1994 wills, all parties agree, are ineffective because they lack the signatures of attesting witnesses, as required by Maryland Code, Estates and Trusts Article, § 4–102. Accordingly, if the 1985 will was effectively revoked by Ms. Binco, she would have died intestate, in which event appellant, her brother and closest surviving relative, who was not named as a beneficiary under the 1985, 1990, or 1994 wills, would inherit. The dispute now before us is therefore between appellant, urging that the 1985 will had been revoked, and appellee, the person who offered that will for probate and who was appointed as personal representative to administer the estate under the will, who contends that the 1985 will had not been effectively revoked.

Over appellant's objection, the Orphans' Court for Baltimore County, apparently applying the doctrine of dependent relative revocation, admitted the 1985 will to probate, notwithstanding its apparent revocation by Ms. Binco. The Circuit Court for Baltimore County affirmed that decision. We granted *certiorari* on our own initiative before any proceedings in the Court of Special Appeals to consider whether the lower courts erred in applying the doctrine and finding the 1985 will to be valid. We believe that they did err and shall therefore reverse.

### *Dependent Relative Revocation*

Section 4–105 of the Estates and Trusts Article permits a will to be revoked by "cancelling . . . the same, by the testator himself. . . ." It is clear, and neither party now suggests

---

1. In the orphans' court, appellee, who offered the 1985 will for probate and who was appointed as personal representative under that will, denied that the handwritten statement purporting to revoke the will "was that of the decedent." In a memorandum filed in the circuit court, he assumed, for purposes of the memorandum, but did not concede, that the writing was that of Ms. Binco. In his brief in this Court, however, he acknowledges that she wrote those words. We shall take that as a belated, but nonetheless effective, judicial admission.

otherwise, that, by writing on the 1985 will "VOID—NEW WILL DRAWN UP 6–28–90" and retaining the will, so marked, among her papers, Ms. Binco intended to revoke that will and that, unless saved by the doctrine of dependent relative revocation, that will was effectively revoked.

As we indicated in *Arrowsmith v. Mercantile–Safe Deposit*, 313 Md. 334, 343, 545 A.2d 674, 679 (1988), no reported Maryland appellate decision has ever applied that doctrine. The doctrine, in its most general form, is described in 2 WILLIAM J. BOWE & DOUGLAS H. PARKER, PAGE ON THE LAW OF WILLS § 21.57 at 446 (rev. ed.1960):

"In general the doctrine of dependent relative revocation applies to invalidate the revocation of a will where it is shown that the revocation was conditioned on the occurrence of certain facts which never came to pass or upon the existence or nonexistence of circumstances which were either absent or present contrary to the condition."

As most commentators, including the revisors of Page's opus, point out, in applying the doctrine, courts often speak in terms of a *conditional* revocation, regarding the revocation as conditioned on the existence of a set of facts or circumstances that the testator assumes to exist, when, in reality, the revocation is itself unconditional but is rather based on a mistaken frame of mind—a mistake of either fact or law. They give as an example of a mistake of fact the circumstance in which a testator physically destroys his will believing that the document he is destroying is not his will but some other instrument. In that circumstance, they suggest, the necessary intention to revoke the will is clearly lacking, and a "mistake of this sort prevents revocation, although all the other elements are present." *Id.* at 448. There is no need in that situation to construe the revocation as a "conditional" one—the presumed condition being that the document being destroyed is not the testator's will—for a mistake of that kind suffices on its own to justify granting relief.

The more troublesome branch of the doctrine is where the mistake is not in the act of revocation itself but in the

inducement for the act, arising from facts or circumstances extrinsic to the instrument revoked. This often takes the form of a mistake of law or of legal consequences. The most common instance of this form is "where a testator revokes a later will in the belief that he can thus put a prior will into effect, or where he revokes a prior instrument thinking that a later instrument has been executed in due form and that no other facts exist which will prevent such instrument from operating as a later will." *Id.* at 448. *See also* Joseph Warren, *Dependent Relative Revocation,* 33 Harv. L.Rev. 337, 342 (1920).

It is possible, of course, for a testator to make clear that his revocation of an existing will is conditioned on the legal validity or effectiveness of some other instrument, but, as the Page authors note, in most instances the testator has simply assumed that state of affairs and has articulated no such condition. In such cases, the revocation is really less of a conditional one than one based on a mistake of law which, if regarded in that manner, would not normally suffice to avoid an otherwise deliberate act. Some courts, in an effort to effectuate what they presume would have been the testator's intent had he known the true circumstances, have thus constructed the fiction of a conditional, or dependent relative, revocation, as a more plausible theory upon which to provide relief. *See* George E. Palmer, *Dependent Relative Revocation and its Relation to Relief for Mistake,* 69 Mich. L.Rev. 989–90 (1970–71):

> "The one part of the law of wills in which courts often do give relief for mistake is in connection with revocation by holding that an apparent revocation was ineffective because of mistake in underlying assumptions. Rarely, if ever, however, does a modern court rest its decision squarely on its power to relieve for mistake. Instead, the testator's intent to revoke is regarded as conditioned upon the truth of the matter in question; since the condition has not been met the conclusion is reached that there was no revocation for lack of the requisite intent. This is the doctrine of dependent relative revocation. *It rests upon an analysis that,*

*with few exceptions, is found nowhere else in the law relating to mistake in underlying assumptions."*

(Emphasis added.)

This theory, almost peculiar to revocations of wills, gained initial currency in English decisions. Joseph Warren, *Dependent Relative Revocation, supra,* 33 Harv. L.Rev. at 337. As Page, and increasingly many courts, have warned, however, the testator's true intentions in a mistake of law-implied condition context are often ambiguous—harder to discern with real clarity and authority—and, before applying legal fictions based on undocumented presumptions to accept as valid a will that has otherwise been facially revoked in accordance with all legal prerequisites, courts need to examine the circumstances with great care and caution.[2] We shall turn now to those circumstances, as they appear in this case.

### *The Four Wills and the Proceedings Below*

When Ms. Binco died, her only heir was her brother, Henry J. Kroll, the appellant. Mr. Kroll was not mentioned as a beneficiary in any of the three later wills; the 1980 will is not in the record before us, but, from a comment made during the hearing in the circuit court, it appears that he was left a car in that will. The 1985 will was drawn by an attorney and made a complete disposition of Ms. Binco's estate. She left her jewelry, furs, and furniture to five individuals—Charmaine Kilmartin, Esther Strebech, Betty Ball, Joan Romanowski, and Phyllis Butler; a credit union account was left to a sixth

---

2. In his law review article, Professor Palmer notes that the doctrine has generally not been applied "where the revocation was not connected with some alternative plan for succession to the decedent's estate or a part of it, and the plan failed to take effect." *Dependent Relative Revocation and its Relation to Relief for Mistake, supra,* 69 Mich. L.Rev. at 991. Even with that "outer limit," he notes that, in most cases where the doctrine has been applied, the testator actually attempted to make a substitute disposition by will and that an "area of doubt" lies "between the frustrated attempt to dispose and the uncompleted plan to dispose which had not reached the stage of an attempt." *Id.* at 991. *See,* for example, *Semmes v. Semmes,* 7 H. & J. 388 (Md.1826), *In re Emernecker's Estate,* 218 Pa. 369, 67 A. 701 (1907).

individual; AT & T stock was bequeathed equally to two charities—First Church of God and Lutheran Social Services of Maryland; and Standard Oil Company stock was left to Spay and Neuter All Pets, Inc. St. John's Lutheran Church, the First Church of God, and Spay and Neuter All Pets, Inc. shared equally in the residuary bequest. Ms. Romanowski was named as personal representative.

The 1990 will, which was handwritten and contained a number of margin notes and interlineations, had no residuary clause, so it is not clear whether that will made a complete disposition of Ms. Binco's estate. None of the individuals mentioned in the 1985 will were included in the 1990 will. Some of the beneficiaries are referred to only by their first names—Ms. Binco's house and certain stock, for example, is left to "Richard and Sharyn"; clothing is left to "Chris"; mink stoles are left to "Bea" and "Pat." Other bequests suggest that "Richard" is Richard Kroll, appellant's son and Ms. Binco's nephew. In a Notice of Hearing sent later by the Register of Wills, "Sharyn" is identified as Sharyn L. Trent, but it is not clear from the record what, if any, relationship she has with Richard Kroll or with Ms. Binco.[3] Pat Sonneborn, Bea Reynolds—possibly the "Pat" and "Bea" named as legatees—along with a "Hank," who might be appellant, are listed as executors. The First Church of God is mentioned in the will, but it is not at all clear what, if any, bequest is made to that charity. One or more of the interlineations appear to have been made after the initial will was written. A provision stating "Pay Norman Lauenstein—Atty," for example, is crossed out, and, in the margin is written "Paid Him."

The 1994 will is also a handwritten document, containing no residuary clause. At the top, Ms. Binco declares it as her Last Will and Testament and states that she "would like to designate the following items to those mentioned below." Her

---

**3.** In the 1980 will which, as noted is not in the record before us but which is in that part of the official file that was retained by the Orphans' Court for Baltimore County and not sent to the circuit court, Ms. Trent is identified as Ms. Binco's niece.

car, which in the 1990 will went to Richard Kroll, was given to Pat Sonneborn. Her house, which was formerly to go to Sharyn and Richard, was left to Beate Reynolds. With the exception of a bedroom set and table that were left to Pat Sonneborn, the furniture in the house was left to Ms. Reynolds as well. A credit union account was left to Ms. Sonneborn and a Rosedale Federal account was left to Ms. Reynolds. Certain stock was bequeathed 50% to Richard Kroll, 25% to Ms. Sonneborn, and 25% to Ms. Reynolds. One thousand dollars of insurance was left to the First Church of God, and another $1,000 was left to Friends of Animals. Ms. Sonneborn and Richard Kroll were designated as executors.

Neither the 1990 will nor the 1994 will make any reference to any earlier will, and, as noted, neither contains the signatures of any attesting witnesses, although the 1990 will has a place designated for witnesses.

Unfortunately, the record of proceedings in the orphans' court transmitted to this Court does not constitute the complete file and is somewhat difficult to follow, although we can piece together essentially what occurred from what we have and from what the parties assert in their briefs. At some point after Ms. Binco's death, Richard Kroll presented the 1990 will for judicial probate. Subsequently, appellee presented the 1980 will for judicial probate. At a hearing held on March 14, 1995, appellant produced the 1985 will which, over his objection, was admitted to probate. Appellee, identified as the Pastor of St. Johns's Lutheran Church, was appointed as personal representative. Appellant then filed a caveat to the will contending, among other things, that Ms. Binco did not have sufficient mental capacity to make that will, that the contents of the will had not been read or explained to her, that the will was procured by fraud and undue influence, and that it had, in any event, been subsequently revoked. In an amended petition and caveat, he asked that those issues be tried in the circuit court. On August 9, 1995, the orphans' court dismissed appellant's amended petition and caveat, without assigning any reasons. In that same order, the court formally rejected the 1990 will on the ground that "it does not

satisfy the statutory requirement of a valid will and is not in good form."

Appellant noted an appeal to the circuit court but in that court effectively abandoned any complaint with respect to Ms. Binco's testamentary capacity or to any fraud or undue influence. The sole question presented to the circuit court was whether the orphans' court erred in applying the doctrine of dependent relative revocation and admitting the 1985 will to probate, notwithstanding its apparent revocation. After a brief evidentiary hearing, the court entered an order affirming the admission of the 1985 will to probate. The basis of its ruling was that "the revocation of the April 12, 1985 Will was so related to the making of the June 28, 1990 Will as to be dependent on it. Therefore, since the June 28, 1990 Will was invalid, the April 12, 1985 Will, whose contents can be ascertained, should be given effect."

### *Application of Dependent Relative Revocation*

■ At issue here is the branch of the dependent relative revocation doctrine that, in effect, disregards conduct otherwise qualifying as a revocation of a will when that conduct, in the court's view, was based on an assumption by the testator that the will being revoked would be immediately replaced by a valid new will. It is the "mistake of law" branch of the doctrine. Two overlapping and confluent assumptions underlie the theory. One was expressed in a 1929 Annotation, A.G.S., *Effect of Testator's Attempted Physical Alteration of Will After Execution*, 62 A.L.R. 1367, 1401 (1929):

> "It is based upon the presumption that the testator performed the act of revocation with a view and for the purpose of making some other disposition of his property in place of that which was canceled, and that there is, therefore, no reason to suppose that he would have made the change if he had been aware that it would have been wholly futile, but that his wishes with regard to his property, as expressed in his original will, would have remained unchanged, in the absence of any known and sufficient reason for changing them."

*See also* the 1952 update of that Annotation, L.S. Tellier, *Effect of Testator's Attempted Physical Alteration of Will After Execution,* 24 A.L.R.2d 514, 554 (1952).

■■■■ A second, or perhaps simply a different articulation of the same, theory offered in support of the doctrine comes into play when, as is often the case, the effect of not disregarding the revocation is for the decedent's estate, or some part of it, to pass intestate. *See In re Macomber's Will,* 274 A.D. 724, 87 N.Y.S.2d 308, 312 (1949): "The rule seeks to avoid intestacy where a will has once been duly executed and the acts of the testator in relation to its revocation seem conditional or equivocal." *See also Goriczynski v. Poston,* 248 Va. 271, 448 S.E.2d 423, 425 (1994). The law disfavors intestacies and requires that, whenever reasonably possible, wills be construed to avoid that result. *Crawford v. Crawford,* 266 Md. 711, 719, 296 A.2d 388, 392 (1972). Courts have made it clear, however, that the law's preference for a testate disposition is always subordinate to the intention of the testator, whether ascertained or presumed. *See Charleston Library Soc. v. Citizens & Southern Nat. B.,* 200 S.C. 96, 20 S.E.2d 623, 632 (1942).

Although, as noted, this Court has never applied the doctrine, we have discussed aspects of it in three cases. In *Semmes v. Semmes,* 7 H. & J. 388 (Md.1826), the testator had a will leaving his entire estate to his wife, in trust for herself and his infant son until the child reached 21, at which point one-half of the personal property was to go to her absolutely. When his wife predeceased him, the testator used a pen to obliterate his signature and those of the attesting witnesses and to write on the bottom of the will, "In consequence of the death of my wife, it is become necessary to make another will." *Id.* at 389. Unfortunately, he died before making another will. The orphans' court refused to probate the existing will, and this Court affirmed that judgment. Our predecessors discussed the doctrine of dependent relative revocation as it had been applied in some English cases, notably *Onions v. Tyrer,* 1 P. Williams, 343 (1717), characterizing the doctrine as based on a mistake principle:

"The cancelling of a will is said to be an equivocal act, and not to effect a revocation, unless it is done *animo revocandi.* And where it is a dependent relative act, done with reference to another, which is meant and supposed to be good and effectual, it may be a revocation or not, as to that to which it relates is efficacious or not. As where a man having duly executed one will, afterwards causes another to be prepared, and supposing the second to be duly executed, under that impression alone cancels the first. In such case it has been held, that on the second turning out not to have been duly executed, the cancelling the first, being done by mistake and misapprehension, would not operate as a revocation."

7 H. & J. at 390–91.

Having so characterized the doctrine, the Court made clear that the doctrine would never apply "where a man has deliberately and intentionally cancelled his will, as in this case, in the entire absence of all accident or mistake, notwithstanding he may, at the time, have intended to make another will." *Id.* at 391. We accepted, from the evidence, that the testator did not intend to die intestate but held that "however that may be, we cannot make a will for him." *Id.* On its facts, *Semmes* was similar to the situation in *In re Emernecker's Estate, supra,* 218 Pa. 369, 67 A. 701, where the revocation also was not actually accompanied by the preparation of a new, albeit ineffective will.

Our second brush with the doctrine was in *Safe Dep. & Trust Co. v. Thom,* 117 Md. 154, 83 A. 45 (1912), which presented somewhat the same situation as *Semmes,* although with different facts. The testatrix, who had five children, had signed a valid will in March, 1907. Item I of that will left $10,000 in cash to four of the children; Item II left $10,000 in trust for the fifth child, who apparently was mentally disabled. After providing for some additional small bequests, the testatrix left the residue of her estate in trust, with one-fifth of the income to be paid quarterly to each of the five children during their lives (the disabled son's share to be paid to his trustee), and a one-fifth share of the corpus to be paid to the children of

any deceased child. In April, 1910, the testatrix informed her attorney that she wanted to change her will to leave the one-fifth shares to the four competent children outright and not in trust and to make a number of other minor bequests. She said that she would prepare and send to the lawyer a list of those bequests. In June, 1910, she informed him that she had rubbed out the first provision in her will, leaving the competent children $10,000 each, since they would be getting their full one-fifth share absolutely. The lawyer stated that he told the testatrix not to attempt to change the will in that manner.

The testatrix died without ever making a new will or sending the lawyer the list of new bequests. Among her papers was the 1907 will on which the names of the four children in Item I had been rubbed but the letters then relined or retraced in pencil. Accompanying the will, in a sealed envelope, was a letter to the lawyer containing the list of bequests. With the agreement of all parties, the trustee named in the will offered the will for probate, following which two of the competent children petitioned the orphans' court to declare the will cancelled and revoked by reason of the erasure. The court, over objection, granted the petition and denied probate. We reversed.

Although, as in *Semmes,* we discussed the doctrine of dependent relative revocation, that was not the basis for our decision. Rather, we concluded from the evidence that there was no revocation of the will in the first instance. The act that might be regarded as a revocation—the attempt to obliterate a provision—was incomplete, "not in the sense that the clause was not entirely rubbed out or obliterated, but in the sense that that which was begun was not finished and was abandoned." *Id.* at 163, 83 A. 45. Before completing any obliteration, we noted, the testatrix changed her mind and retraced the letters rubbed, thereby indicating an intent not to revoke the instrument.

Our most recent consideration of the doctrine came in *Arrowsmith v. Mercantile–Safe Deposit, supra,* 313 Md. 334, 545 A.2d 674. The testator there left three relevant wills,

drawn, respectively in 1966, 1976, and 1982, the earlier wills each being expressly revoked by a provision in the next succeeding will. All three wills purported to exercise a power of appointment given to the testator through a 1953 deed of trust from his mother. When the testator died in 1983, a question was raised whether the appointment in the 1982 will violated the rule against perpetuities. Indeed, the circuit court held that there was such a violation, a conclusion that we affirmed. The power as exercised in the 1966 will did not present a perpetuities problem, and, in an effort to save the testamentary disposition and not have the property distributed under the 1953 deed of trust in default of an appointment, the parties who would be benefitted by that approach asked the court to sustain the 1966 provision under a theory of dependent relative revocation. The theory seemed to be that, had the testator been aware that his exercise of the power in the 1976 and 1982 wills would be ineffective, he would not have revoked the 1966 provision.

As was the case in *Semmes* and *Safe Dep. & Trust Co.*, it was not necessary for us in *Arrowsmith* to determine whether we would accept the doctrine in any of its manifestations, for even if accepted into Maryland law, it could not be applied as urged. At 345, 545 A.2d 674, we noted that "[p]lucking the perpetuities saving clause from the 1966 will and inserting it in the 1982 will is inconsistent with the theoretical justification for the doctrine." Harking back to what the Court said in *Semmes,* Judge Rodowsky pointed out that "this Court is neither empowered to write a will for [the testator] nor structure a will that differs from any will which [the testator] ever executed." *Id.* at 350, 545 A.2d 674.

This case presents for the first time a situation in which the doctrine *might* be applied and in which other courts have applied it. It is not a situation, however, in which we believe it appropriate to apply the doctrine.

It is important to keep in mind that, in the context now before us, the doctrine rests on a fiction that is, in turn, supported only. by an assumption as to what Ms. Binco would

have done had she known that her 1990 will was invalid. As Professor Warren observed in his law review article, "[t]he inquiry should always be: What would the testator have desired had he been informed of the true situation?" Joseph Warren, *Dependent Relative Revocation, supra,* 33 Harv. L.Rev. at 345. The most rational and obvious answer to that question, of course, is that the testator would have desired to make the new instrument effective, and, if presumed intent were to control, the court would simply overlook the statutory deficiency and probate the new will, rather than overlook the legal effect of an otherwise deliberate revocation and probate the old one. That is an option the law does not permit, however. We thus must look for secondary, fictional intentions never actually possessed by Ms. Binco. The real question is what Ms. Binco would have wanted to do if she had been told that she was unable to make a new will: would she have preferred her estate to pass under the existing (1985) will to persons she had decided to remove as beneficiaries, or would she have preferred that her estate pass intestate to her brother?

In attempting to arrive at a reasonable answer to that kind of question, courts have considered all of the relevant circumstances surrounding the revocation—the manner in which the existing will was revoked,[4] whether a new will was actually made and, if so, how contemporaneous the revocation and the making of the new will were,[5] parol evidence regarding the testator's intentions, and the differences and

---

4. The manner in which the existing will was revoked can be significant in determining whether the testator actually intended a revocation, whether conditionally or unconditionally. *See In re Roeder's Estate,* 44 N.M. 578, 106 P.2d 847 (1940).

5. Courts generally will not apply the doctrine to save a revoked will when the testator, notwithstanding his announced intention to do so, in fact fails to make a new will. *See Roberts v. Fisher,* 230 Ind. 667, 105 N.E.2d 595 (1952); *Matter of Estate of Cox,* 190 Mont. 436, 621 P.2d 1057 (1980); *Matter of Estate of Ausley,* 818 P.2d 1226 (Okla.1991); *In re Estate of Hall,* 7 Wash.App. 341, 499 P.2d 912 (1972); *In re Rauchfuss' Estate,* 232 Wis. 266, 287 N.W. 173 (1939). As noted, we followed that approach in *Semmes v. Semmes, supra,* 7 H. & J. 388.

similarities between the old and new wills. The courts recognize that the question is always one of presumed intent. In many cases, because the other evidence is either inconclusive or nonexistent, the principal focus is on the differences and similarities between the two instruments. In that regard, the courts have generally refused to apply the doctrine unless the two instruments reflect a common dispositive scheme. *See In re Lubbe's Estate,* 142 So.2d 130 (Fla.Dist.Ct.App.1962), *overruled on other grounds by In re Estate of Johnson,* 359 So.2d 425 (Fla.1978); *In re Heazle's Estate,* 72 Idaho 307, 240 P.2d 821 (1952); *Wallingford's Ex'r v. Wallingford's Adm'r,* 266 Ky. 723, 99 S.W.2d 729 (1936); *In re Houghten's Estate,* 310 Mich. 613, 17 N.W.2d 774 (1945); *Watson v. Landvatter,* 517 S.W.2d 117 (Mo.1974); *Guardianship & Conserv. of Estate of Tennant,* 220 Mont. 78, 714 P.2d 122 (1986); *Matter of Estate of Patten,* 179 Mont. 299, 587 P.2d 1307 (1978); *Flanders v. White,* 142 Or. 375, 18 P.2d 823 (1933); *In re Dougan's Estate,* 152 Or. 235, 53 P.2d 511 (1936); *In re Crooks' Estate,* 388 Pa. 125, 130 A.2d 185 (1957); *Chambers v. Chambers,* 542 S.W.2d 901 (Tex.Civ.App.1976); and *cf. Ruth v. Ruth,* 123 A.2d 132 (Del.Ch.1956); but *compare Carter v. First United Methodist Church,* 246 Ga. 352, 271 S.E.2d 493 (1980) and *In re Macomber's Will,* 274 A.D. 724, 87 N.Y.S.2d 308 (1949).

Conversely, courts that have applied the doctrine have looked to the similarity of the new and old dispositive schemes as a basis for concluding that the testator indeed intended the revocation to be conditional and that he would have preferred to have his estate pass under the old will rather than through an intestacy. *See In re Kaufman's Estate,* 25 Cal.2d 854, 155 P.2d 831 (1945); *In re Cuneo's Estate,* 60 Cal.2d 196, 32 Cal.Rptr. 409, 384 P.2d 1 (1963); *La Croix v. Senecal,* 140 Conn. 311, 99 A.2d 115 (1953); *In re Nutting's Estate,* 82 F.Supp. 689 (D.D.C.1949); *In re Jones,* 352 So.2d 1182 (Fla. Dist.Ct.App.1977); *Blackford v. Anderson,* 226 Iowa 1138, 286 N.W. 735 (1939); *In re McKay's Estate,* 347 Mich. 153, 79 N.W.2d 597 (1956); *Charleston Library Soc. v. Citizens & Southern Nat. B.,* 200 S.C. 96, 20 S.E.2d 623 (1942); *Bell v. Timmins,* 190 Va. 648, 58 S.E.2d 55 (1950).

In the case before us, Ms. Binco indicated a clear intent to revoke her 1985 will by writing VOID on the back of it. Unlike the situation in *Safe Dep. & Trust Co., supra*, 117 Md. 154, 83 A. 45, there is nothing ambiguous about her intent to revoke that will. Also unlike that case and *Semmes*, however, she did contemporaneously handwrite a new will, thereby indicating with some clarity that her act of revocation was based on her mistaken belief that the new will was valid and would replace the old one. The confluent inference, that she intended to revoke the 1985 will based on her belief that it would be superseded by the 1990 will, does not alone justify application of the doctrine of dependent relative revocation. We must still search for that fictional presumed intent of what she would have done had she been informed that she could not make a new will. There was some evidence that Ms. Binco did not have a good relationship with her brother and would not have desired that he take any part of her estate. That evidence was contradicted, however, by testimony that appellant and his sister did have a cordial relationship.

We turn, then, to a comparison of the 1985 and 1990 wills and, as noted, we find two very different dispositive schemes. Apart from the fact that the 1990 will did not contain a residuary clause and may not have effected an entirely testate disposition, the fact is that, with the possible exception of the First Church of God, whose status under the 1990 will is, at best, unclear, none of the beneficiaries under the 1985 will were named in the 1990 will. The 1990 will replaced them all, indicating that Ms. Binco did not wish any of them (again with the possible exception of the First Church of God) to be benefitted. The effect of applying the doctrine and disregarding her revocation, however, is precisely to do what she clearly did not want done—to leave her estate to people she had intended to disinherit. We cannot fairly presume such an intent on her part; nor should the lower courts have done so.

We need not decide in this case whether the doctrine of dependent relative revocation, as articulated above, is part of Maryland law and, if it is, the circumstances under which it

may properly be applied. It cannot be applied under the circumstances of this case.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO REVERSE ORDER OF ORPHANS' COURT ADMITTING 1985 WILL TO PROBATE; APPELLEE TO PAY THE COSTS.

ELDRIDGE, J., concurs in the result only.