BOULDER OAKS COMMUNITY ASSOCIATION, A NEVADA CORPORATION, DBA RED MOUNTAIN RV RESORT, APPELLANT, *v.* B & J ANDREWS ENTERPRISES, LLC, A NEVADA LIMITED LIABILITY COMPANY, DBA BOULDER OAKS RV RESORT, RESPONDENT.

No. 46010

August 20, 2009                                   215 P.3d 27

[En banc reconsideration denied January 19, 2010]

*Sterling Law, LLC*, and *Beau Sterling*, Las Vegas; *Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP*, and *Richard J. Vilkin*, Las Vegas, for Appellant.

*Bailus Cook & Kelesis* and *Mark B. Bailus* and *Marc P. Cook*, Las Vegas, for Respondent.

# OPINION

*Per Curiam:*

## INTRODUCTION

On November 1, 2007, this court issued an opinion in this appeal affirming the district court's order. Thereafter, appellant Boulder Oaks Community Association (the Association) filed a petition for rehearing pursuant to NRAP 40. On April 18, 2008, this court issued an order withdrawing the opinion from publication pending resolution of the petition for rehearing. We will consider rehearing when we have overlooked or misapprehended material facts or questions of law or when we have overlooked, misapplied, or failed to consider legal authority directly controlling a dispositive issue in the appeal. NRAP 40(c)(2). Having reviewed the briefing associated with the Association's petition for rehearing, we conclude that rehearing is warranted, and we grant the Association's petition for rehearing. We now issue this opinion in place of our prior opinion.

Respondent B & J Andrews Enterprises, LLC (Andrews), owns the Boulder Oaks R.V. Resort (the resort), a common-interest community that consists of 275 recreational vehicle lots and two additional lots initially owned by BCRV, Ltd.[2] The resort is governed by its covenants, conditions, and restrictions (CC&Rs). Andrews argues

---

[2]*See* NRS 116.021 (defining a common-interest community as ''real estate with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for real estate other than that unit'').

that CC&R section 5.04 gives it an exclusive right to rent the recreational vehicle lots when the lot owners are not using them and that, pursuant to CC&R section 9.04(a), the CC&Rs cannot be materially amended without its approval. Andrews moved for a preliminary injunction when the Association attempted to amend the CC&Rs to remove the exclusive rental provision without Andrews' approval. The district court granted the preliminary injunction, thereby enjoining the Association from amending the CC&Rs to eliminate the exclusive rental provision. This appeal followed.

Because this appeal involves a common-interest community, it is governed by NRS Chapter 116, which is Nevada's codification of the Uniform Common-Interest Ownership Act (UCIOA). On appeal, the primary questions we resolve are (1) whether Andrews is a "declarant" and (2) whether section 9.04(a) of the CC&Rs contravenes NRS 116.2107(4), which prohibits units from constituting a class for the purposes of voting merely because they are owned by a declarant. We conclude that Andrews is a declarant. Further, we conclude that CC&R section 9.04(a) violates NRS 116.2107(4) by creating an improper voting class in the declarant, making this part of section 9.04 void. Thus, the Association was not required to obtain Andrews' consent before amending the CC&Rs. We also conclude that it was proper for the Association to vote on the proposed amendment by mail, as opposed to voting at a meeting. Therefore, because the record demonstrates that the Association received the requisite number of votes to amend the CC&Rs, we conclude that Andrews does not have a reasonable likelihood of success on the merits in the case below. Our conclusion illustrates that the amendment was proper and the Association should not have been enjoined from enforcing it. Accordingly, we reverse the district court's grant of the preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

### Development of the community

The resort was developed by BCRV, Ltd. Upon completion of the development, BCRV drafted and recorded the resort's CC&Rs, which fully incorporated NRS Chapter 116. In 1995, the Association, a nonprofit corporation and lot owners' association, was formed. At the time the resort was developed, Boulder City prohibited recreational vehicle lot owners from occupying their lots for more than 180 days per year, and in 1996, BCRV amended the CC&Rs to add section 5.04, which governs the rental of lots.[3] Sec-

---

[3]In full, CC&R section 5.04 states:

*Rental of Lots.* No restrictions are placed herein regarding an Owner's right to sell his Lot. However, the Developer shall have for a period of ninety-nine (99) years from the date of this Declaration the exclusive

tion 5.04 states that "the Developer" has a 99-year exclusive right to rent a lot when it is not being used by the owner or his approved guest. Section 5.04 further gives the developer the right to retain 40 percent of the rent collected, while the remaining 60 percent belongs to the lot owner.

### BCRV assigns its rights to Andrews

In 2001, BCRV sold its two lots, the resort, and all attendant rights, including the right to manage the rentals, to Andrews. For some time after Andrews took over the resort and rental services, the lot owners continued to use Andrews' services to rent their lots, as required by the CC&Rs. However, in 2002 and in apparent violation of CC&R section 5.04, a few lot owners began to rent their lots independent of Andrews. Initially, Andrews sought to enforce section 5.04 through the Association.

### Amendment of the CC&Rs

CC&R section 9.04 governs the procedures for amending the CC&Rs. Section 9.04(a) permits a material amendment upon receiving the consent of 67 percent of the "Members entitled to vote and of the Declarant, so long as the Declarant owns any land subject to this Declaration."[4] CC&R section 1.12 defines "declarant" as BCRV and "its successors and assigns." If a proposed amendment changes "the uses to which a particular Lot is restricted," then section 9.04(d) provides that the affected lot owner and the majority of lot owners must consent. Section 2.06 of the Association's bylaws sets forth the procedure for taking action without a meeting. It provides that a meeting is not required if the percentage of members

right, in the absence of use by the Owner or his registered and approved guest, to rent Lots which are a part of the Resort at scheduled rates promulgated from time to time by the Developer. The Developer shall retain for its services forty percent (40%) of the gross amount of the rental collected on any Lot with the remaining sixty percent (60%) reserved for the benefit of the Lot Owner.

[4]Precisely, section 9.04 states, in pertinent part:

(a) *Majority Vote.* Except as provided in Section 9.04(c), no amendment of this Declaration shall be effective unless adopted by a majority of the Members. Notwithstanding the foregoing, the consent of sixty-seven percent (67%) of the Members entitled to vote and of the Declarant, so long as the Declarant owns any land subject to this Declaration, and the approval of Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to a Mortgage, shall be required to materially amend any provisions of this Declaration . . . .

(d) *Restrictions on Amendment.* Except to the extent expressly permitted or required by the provisions of NRS Chapter 116, no amendment may change . . . the uses to which a particular Lot is restricted, in the absence of consent of the Owner of the Lot affected and the consent of a majority of the Owners of the remaining Lots.

required to take the specific action give their written consent to proceed without a meeting.[5]

Beginning in 2004, members of the Association sought amendment of the CC&Rs to eliminate section 5.04. The Association mailed ballots to every lot owner of record, which stated that votes had to be received by the deadline or any extension thereof. The initial ballot set the voting deadline at January 15, 2004, which was apparently a typographical error because that date had already passed. The Association informed members of the error and corrected the date to be January 15, 2005. Subsequently, the Association passed two 30-day extensions. Ultimately, 187 votes, or just over 67 percent of the 277 possible votes, were cast in favor of amending the CC&Rs to remove section 5.04.

Andrews immediately filed suit seeking a preliminary injunction in the district court seeking to stop the Association from eliminating section 5.04 from the CC&Rs. Andrews claimed that the amendment was invalid, arguing that in order to materially amend the CC&Rs, its consent as a land-owning declarant was required. Further, Andrews argued that the written ballot procedure used by the Association to pass the amendment violated section 2.06 of the Association's bylaws. Andrews also asserted that NRS Chapter 116 did not apply to the case.

In response, the Association argued that NRS Chapter 116 applied. Accordingly, the Association argued that Andrews was not a declarant because, regardless of whether the CC&Rs categorized Andrews as such, the CC&R definition was null since Andrews was not a declarant under the term's definition as set forth in NRS 116.035. Therefore, because Andrews was not a declarant, the Association claimed that the amendment was proper because the Association was not required to obtain Andrews' consent. In the alternative, the Association argued that, even if Andrews was a declarant, NRS 116.3105 authorized it to terminate any contract executed by the declarant before the lot owners assumed control of the Association. Finally, the Association argued that the vote to amend the CC&Rs was proper pursuant to NRS 82.326 and because it complied with section 2.06 of the Association's bylaws.

The district court disagreed with the Association, finding that it had violated CC&R section 9.04(a) and that Andrews was entitled to injunctive relief. The district court entered an injunction enjoining the Association from eliminating CC&R section 5.04 and thereby prohibiting independent rentals by the lot owners.

---

[5]Specifically, section 2.06 of the Association's bylaws states, in part:

Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by the Members with the percentage of the voting power required to take such action.

The Association appealed the matter to this court. The Association argued that not only was the amendment proper for the reasons it had presented to the district court, but it was also proper because the clause in CC&R section 9.04(a) that required the consent of a land-owning declarant to pass a material amendment violated NRS 116.2107(4).

## DISCUSSION

### Standard for granting and reviewing a preliminary injunction

A preliminary injunction is available when the moving party can demonstrate that the nonmoving party's conduct, if allowed to continue, will cause irreparable harm for which compensatory relief is inadequate and that the moving party has a reasonable likelihood of success on the merits. *See* NRS 33.010; *University Sys. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004); *Dangberg Holdings v. Douglas Co.*, 115 Nev. 129, 142, 978 P.2d 311, 319 (1999). A district court has discretion in deciding whether to grant a preliminary injunction. *University Sys.*, 120 Nev. at 721, 100 P.3d at 187. The district court's decision " 'will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.' " *Attorney General v. NOS Communications*, 120 Nev. 65, 67, 84 P.3d 1052, 1053 (2004) (quoting *U.S. v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)); *see S.O.C., Inc. v. The Mirage Casino-Hotel*, 117 Nev. 403, 407, 23 P.3d 243, 246 (2001). Questions of law are reviewed de novo, even in the context of an appeal from a preliminary injunction. *University Sys.*, 120 Nev. at 721, 100 P.3d at 187; *S.O.C., Inc.*, 117 Nev. at 407, 23 P.3d at 246.

Here, we conclude that the district court abused its discretion in granting Andrews' motion for a preliminary injunction because Andrews does not enjoy a reasonable likelihood of success on the merits. Although Andrews is a land-owning declarant, the Association did not need Andrews' consent to amend the CC&Rs because that clause of section 9.04(a) is void for being in violation of NRS 116.2107(4). Therefore, because the Association properly voted to eliminate CC&R section 5.04, the preliminary injunction was not appropriate.[6]

### Reasonable likelihood of success on the merits

In arriving at our conclusion that the district court abused its discretion when it granted the preliminary injunction, we first deter-

---

[6]Given our conclusion that Andrews does not have a reasonable likelihood of success on the merits, we need not reach the issue of whether Andrews would suffer irreparable harm.

mine that NRS Chapter 116 applies. We next conclude that Andrews is a land-owning declarant. However, we hold that the Association did not need Andrews' consent to eliminate section 5.04 from the CC&Rs because the clause from section 9.04(a) that required Andrews' consent as a land-owning declarant is void for being in violation of NRS 116.2107(4). Further, we conclude that it was proper for the Association to vote on the proposed amendment by mail, instead of at a meeting. Thus, because we conclude that the Association properly amended the CC&Rs to eliminate section 5.04, Andrews has failed to demonstrate a reasonable likelihood of success on the merits and the grant of the preliminary injunction must be reversed.

### NRS Chapter 116

NRS Chapter 116 codifies Nevada's adoption of the UCIOA, an act adopted by the National Conference of Commissioners on Uniform State Laws. *See* NRS 116.001; A.B. 221, Summary of Legislation, 66th Leg. (Nev. 1991). The purpose of NRS Chapter 116 is to "make uniform the law with respect to the subject of this chapter among states enacting it." NRS 116.1109(2). While NRS Chapter 116 generally applies to all Nevada common-interest communities, it only applies to communities containing lots reserved exclusively for nonresidential use if the declaration so provides. NRS 116.1201(1) and (2)(b). A lot has a "residential use" if it is used as a dwelling or for "personal, family or household purposes by ordinary customers, whether rented to particular persons or not." NRS 116.083. Examples of residential use lots are "marina boat slips, piers, stable or agricultural stalls or pens, campground spaces or plots, parking spaces or garage spaces, storage spaces or lockers and garden plots for individual use, but do not include spaces or units primarily used to derive commercial income from, or provide service to, the public." *Id.*

Here, the CC&Rs explicitly state that they incorporate NRS Chapter 116.[7] Nonetheless, Andrews attempts to convince this court that the application of NRS Chapter 116 is limited because the resort is nonresidential. Andrews bases this contention on the fact that the Boulder City Municipal Code restricts resort lot owners from occupying their spaces for more than 180 days per year. We reject this contention. Despite the 180-day restriction, we conclude that the resort is a residential common-interest community. By listing campground spaces and piers as examples of residential use lots,

___

[7]The recitals of the CC&Rs state that BCRV was developing the resort as a "recreational vehicle community" and was developing the CC&Rs "under a general plan of development pursuant to Chapter 116 of the Nevada Revised Statutes."

NRS 116.083 clearly implicates that permanent occupancy is not necessary for a lot to qualify as "residential." Moreover, the resort lots are not primarily used for commercial income or public service, another factor NRS 116.083 notes as defining what constitutes a residential unit. Rather, the lots are used as spaces to park recreational vehicles, just as a campground space is used as a site for tents. Further, NRS 116.083 anticipates that residential units will be rented, so the fact that resort lot owners do so does not remove the lots from being categorized as "residential." For these reasons, we conclude that pursuant to NRS 116.083, the lots, and the resort generally, are "residential" and NRS Chapter 116 applies accordingly.[8]

### Andrews is a declarant

The parties contest whether Andrews is a land-owning declarant for purposes of CC&R section 9.04(a). Andrews asserts that it is a declarant because the CC&Rs define it as such. The Association counters that it is irrelevant how the CC&Rs define a declarant because the statutory definition of declarant controls and Andrews does not fit within that definition. While we agree with the Association that the statutory definition of the term "declarant" controls to the extent that a CC&R definition conflicts with the statutory definition, we conclude that, in this case, the CC&R definition of "declarant" fits neatly within the definition provided in NRS 116.035. Therefore, there is no reason to look beyond the CC&R definition, and we disagree with the Association's contentions to the contrary. Since the CC&R definition of "declarant" is consistent with the statutory definition, we conclude that Andrews is the "declarant."

NRS 116.003 states that "[a]s used in this chapter and in the declaration and bylaws of an association, *unless the context otherwise requires*, the words and terms defined in NRS 116.005 to 116.095, inclusive, have the meanings ascribed to them in those sections." (Emphasis added.) The language of NRS 116.003 is based on UCIOA section 1-103. A.B. 221, Summary of Legislation, 66th Leg. (Nev. 1991). The UCIOA states that section 1-103 allows terms defined in the Act "to be defined differently . . . declaration[s] and bylaws." UCIOA § 1-103 cmt. 1 (1994). "Regardless of how terms are used in those documents, however, terms have an unvarying meaning in the Act, and any restricted practice which depends on the definition of a term is not affected by a changed term in the documents." *Id.* The UCIOA then

---

[8]Our conclusion is supported by the UCIOA. *See* UCIOA § 1-103(27) & cmt. 22 (1994); *cf.* UCIOA § 1-207(a) (stating that a nonresidential common-interest community is one "in which all units are restricted exclusively to nonresidential purposes").

explains, by example, that if a declarant attempted to alter the definition of "unit owner" to exclude itself in an attempt to avoid assessments for units that he owns, the attempt would fail because the Act defines a declarant as a unit owner. *Id.*

When NRS 116.003 is read in context with the UCIOA, it is clear that when a term is defined in NRS Chapter 116, the statutory definition controls and any definition that conflicts will not be enforced. To read NRS 116.003 otherwise would lead to the absurd result of rendering the definitions provided in NRS 116.005 to 116.095 mere surplusage. *See Speer v. State*, 116 Nev. 677, 679, 5 P.3d 1063, 1064 (2000). Further, any other reading of the statute would be contrary to the express purpose of NRS Chapter 116, which is to "make uniform the law with respect to the subject of this chapter among states enacting it." NRS 116.1109(2). If this court were to enforce any definition provided by a declaration, then the goal of making the laws concerning common-interest communities uniform would never be reached. *See Speer*, 116 Nev. at 679, 5 P.3d at 1064 (stating that statutes should not be read in a manner that violates the " 'spirit of the act' " (quoting *Anthony Lee R., A Minor v. State*, 113 Nev. 1406, 1414, 952 P.2d 1, 6 (1997))).

Here, CC&R section 1.12 defines a "declarant" as BCRV and "its successors and assigns." NRS 116.035 defines a "declarant," in part, as "any person or group of persons acting in concert who . . . [r]eserves or succeeds to any special declarant's right." NRS 116.089 defines "special declarant's rights" in part, as "rights reserved for the benefit of a declarant to . . . [m]aintain sales offices, management offices, signs advertising the common-interest community and models . . . ." When the CC&Rs were written, BCRV entitled itself the "declarant" and stated in CC&R section 1.13 that its lots would be used for the operation of a sales and rental office and for the purposes of maintaining the resort generally. In other words, BCRV reserved a special declarant right. As BCRV's successor, Andrews obtained this special declarant right to maintain a sales and rental office. Thus, in this case, the CC&R definition of "declarant" is consistent with the definition provided in NRS 116.035. Therefore, the context does not require us to apply a definition other than that provided in CC&R section 1.12, and we conclude that Andrews is the declarant. Further, because Andrews owns the two lots it purchased from BCRV, it is also a land-owning declarant.

*Section 9.04 creates an improper voting class*

Because it is a land-owning declarant, Andrews argues that under CC&R section 9.04(a), the Association could not materially amend the CC&Rs without Andrews' consent. We disagree.

NRS 116.2107(4) states that "[e]xcept as otherwise provided in NRS 116.31032, a declarant may not utilize cumulative or class voting for the purpose of evading any limitation imposed on declarants by this chapter nor may units constitute a class because they are owned by a declarant."[9] The UCIOA acknowledges that precluding units from constituting a voting class simply because they are owned by the declarant "prohibits a practice common in planned communities, where units owned by declarant constitute a separate class of units for voting and other purposes." UCIOA § 2-107 cmt. 9 (1994). Thus, the provision "makes clear that the votes and other attributes of ownership of a unit may not change by virtue of the identity of the owner." *Id.*

In this case, CC&R section 9.04(a) states that to materially amend the CC&Rs, it is necessary to obtain "the consent of sixty-seven percent (67%) of the Members entitled to vote and of the Declarant, *so long as the Declarant owns any land* subject to this Declaration." (Emphasis added.) According to the CC&Rs, lots constitute land subject to the declaration. CC&R section 9.04(d) states that an amendment may not change "the uses to which a particular Lot is restricted," without the lot owner and the majority of the other owners' consent. Section 9.04(d) complies with NRS 116.2117(4).[10]

By requiring the declarant's consent for a material amendment only if the declarant owns units, the CC&Rs create the exact type of class voting that NRS 116.2107(4) prohibits. As noted above, NRS 116.2107(4) expressly states that "units [may not] constitute a class because they are owned by a declarant." Therefore, we conclude that the clause requiring the consent of a *land-owning declarant* to materially amend the CC&Rs is impermissible pursuant to NRS 116.2107(4) and is void. *See* NRS 116.1206(1) (stating that "[a]ny provision contained in a declaration . . . of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration . . . is not required to be amended to conform to those provisions"). We further note that while we conclude that this one clause of section 9.04(a) is void, this determination does not nullify the remainder of section 9.04. *See* NRS 116.2103(1) (noting that the inclusion of a provision in a governing document that "violates any provision of this chapter does not render any other provisions of the governing document invalid or otherwise unenforceable").

---

[9]We note that, as used in this opinion, the terms "units" and "lots" are synonymous.

[10]In pertinent part, NRS 116.2117(4) states that "no amendment may change . . . the uses to which any unit is restricted, in the absence of unanimous consent of the units' owners affected and the consent of a majority of the owners of the remaining units."

Further, we conclude that Andrews' consent to amend the CC&Rs was not required under section 9.04(d) or NRS 116.2117(4). While the CC&Rs state that Andrews' lots are to be used for the purpose of maintaining a sales and rental office, removing the 99-year *exclusive* rental provision does not mean that Andrews can no longer rent lots at the resort.[11] Rather, the amendment means that Andrews is not the *only* entity that can rent lots. Therefore, because the amendment does not change the manner in which Andrews can use its lots, its consent was not required.

Therefore, because more than 67 percent of eligible members voted to eliminate CC&R section 5.04 and its exclusive rental agreement, and because Andrews' consent was not necessary, we conclude that the amendment was proper.[12]

### *Mailing ballots was proper*

The ballots containing the proposed amendment to the CC&Rs eliminating section 5.04 were mailed to all members of the Association. Andrews asserts that the amendment thus fails because the declaration does not allow for an amendment to be made without a meeting.[13] The Association counters that the mail-in vote was permitted according to section 2.06 of the Association's bylaws.

---

[11]We note that CC&R section 5.03 prohibits "professional, commercial or industrial operation of any kind" from being conducted at the resort, unless "expressly authorized" by the Association's board of directors. However, because CC&R section 1.13 states that the "Declarant's Lot shall be used for the operation of the sales and rental office which shall be constructed on the Declarant's Lot," we conclude that the CC&Rs intend for the declarant's lots to be excepted from section 5.03. Therefore, because Andrews is a declarant, it can continue to maintain a rental and sales office on its lot despite the elimination of section 5.04.

[12]In so concluding, we acknowledge that to materially amend the CC&Rs, section 9.04 requires not only 67 percent of eligible members to vote for the amendment but also the approval of at least 51 percent of the eligible mortgage holders. However, CC&R section 7.01(d) states that, upon written request, an eligible mortgage holder will be notified of "any proposed action which would require the consent of a specified percentage of Eligible Holders." The record indicates that the Association did not receive any written requests from eligible mortgage holders stating a desire to vote on Association matters. Accordingly, whether the Association received the consent of 51 percent of eligible mortgage holders is not pertinent to the resolution of this appeal.

[13]Andrews further contends that the Association improperly extended the voting deadline because NRS 82.326 does not provide for extensions. We reject this argument because NRS 82.326 does not support this conclusion. Further, we note that Andrews, and all other voting members, had notice that the voting deadline could be extended because the ballot so provided. The Association then gave all voting members notice of the subsequent extensions.

There are no provisions within NRS Chapter 116 stating that CC&Rs may only be amended at a meeting. Further, NRS 82.326(1), which governs the action of nonprofit corporation members by written ballot in lieu of a meeting, states that "unless prohibited or limited by the articles or bylaws, an action that may be taken at a regular or special meeting of members . . . may be taken without a meeting if the corporation mails or delivers a written ballot to every member entitled to vote on the matter."

Section 2.06 of the Association's bylaws states that an action that otherwise would be taken at a meeting, can be "taken without a meeting, without notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by the Members with the percentage of the voting power required to take such action." In accordance with the bylaws, the Association mailed ballots to all members on the issue of eliminating section 5.04. The Association ultimately reported that at least 67 percent of the members had voted in favor of the amendment.[14]

Section 2.06 of the Association's bylaws, and its allowance for action to occur without a meeting, is permissible pursuant to NRS 82.326. Section 2.06 does not explain how the written consent must be acquired. Thus, we conclude that each member that returned a ballot was simultaneously voting and giving written consent for the amendment to take place without a meeting. Because the Association acquired the requisite 67 percent vote in favor of eliminating CC&R section 5.04, it also acquired the requisite votes necessary for the amendment to take place without a meeting, as is necessary under the bylaws.

## CONCLUSION

We conclude that Andrews is a land-owning declarant. We also determine that the Association was not required to obtain Andrews' consent before materially amending the CC&Rs to eliminate section 5.04, which created a 99-year exclusive rental agreement enjoyed by Andrews. Therefore, because Andrews' consent was not necessary and because the Association acquired the requisite number of votes to pass the amendment, we conclude that Andrews has no reasonable likelihood of success on the merits. Accordingly, the district court abused its discretion in so deciding, and we reverse the order granting a preliminary injunction.

---

[14]We note that Andrews contests how many votes were received in favor of the amendment. However, after reviewing the record, we conclude that the evidence supports the Association's assertion that 187 votes out of 277 were cast in favor of amending the CC&Rs.