In the Matter of the ESTATE OF
WILLIAM MELTON, Deceased.

THE STATE OF NEVADA; LINDA MELTON ORTE; AND SHERRY L. MELTON BRINER, Appellants, v. VICKI PALM; ELIZABETH STESSEL; ROBERT MELTON; BRYAN MELTON; AND JOHN CAHILL, Public Administrator, Respondents.

No. 55634

February 16, 2012                           272 P.3d 668

---

*Catherine Cortez Masto*, Attorney General, and *K. Kevin Benson*, Deputy Attorney General, Carson City, for Appellant the State of Nevada.

*Kehoe & Associates* and *Ty E. Kehoe*, Henderson, for Appellants Linda Melton Orte and Sherry L. Melton Briner.

*Albright Stoddard Warnick & Albright* and *Whitney B. Warnick*, Las Vegas, for Respondents Vicki Palm and Elizabeth Stessel.

*Bowler Smith & Twitchell LLP* and *Russell K. Bowler* and *Jonathan W. Barlow*, Las Vegas, for Respondent John Cahill.

*Solomon Dwiggins & Freer* and *Mark A. Solomon*, Las Vegas, for Respondents Robert Melton and Bryan Melton.

Before SAITTA, C.J., DOUGLAS, CHERRY, GIBBONS, PICKERING, HARDESTY and PARRAGUIRRE, JJ.

## OPINION

*Per Curiam:*

This is a dispute between the State and a testator's daughter and half sisters over his $3 million estate. At issue is the proper distribution of the estate of the testator, who, by way of a handwritten will, attempted to disinherit all of his heirs but was unsuccessful in otherwise affirmatively devising his estate. Under the common law, a disinheritance clause was unenforceable in these circumstances. In the proceedings below, after determining that the testator's handwritten will was a valid testamentary instrument that revoked his earlier will, the district court applied the prevailing common law rule, and thereby deemed the testator's disinheritance clause unenforceable. The court therefore distributed the testator's entire estate to his disinherited daughter, pursuant to the law of intestate succession, and rejected the claim that because he disinherited all of his heirs, his estate must escheat to the State to be used for educational purposes.

Crucially, however, the Nevada Legislature has enacted a statute providing, in pertinent part, that a will includes "a testamentary instrument that merely . . . excludes or limits the right of an individual or class to succeed to property of the decedent passing by intestate succession." NRS 132.370. We conclude that by its plain and unambiguous language, NRS 132.370 abolishes the common law rules that would otherwise render a testator's disinheritance clause unenforceable when the testator is unsuccessful at affirmatively devising his or her estate. Here, although the district court correctly determined that the testator executed a valid handwritten will that revoked his earlier will, the court erred in deeming the disinheritance clause contained therein unenforceable.

Next, we consider whether to adopt the doctrine of dependent relative revocation, which, broadly stated, provides that a revocation made in connection with a failed dispositive objective or false assumption of law or fact should be considered ineffective when doing so is necessary to ensure that an estate is distributed in a manner that most closely matches the testator's probable intent. In this, we consider whether the district court erred in determining that the doctrine is precluded by NRS 133.130, which provides, in

relevant part, that where a testator executes two wills, the revocation of the second will does not operate to ''revive the first will,'' absent terms in the revocation expressing an intention to revive the first will or the reexecution of the first will. We conclude that NRS 133.130 restricts revival, a concept that is fundamentally distinct from the doctrine of dependent relative revocation. Furthermore, because we believe that the general policy underlying the doctrine of dependent relative revocation is sound, we take this opportunity to expressly adopt the doctrine. Here, while the district court erred in determining that NRS 133.130 precludes the doctrine of dependent relative revocation, it did not err in alternatively determining that if the doctrine exists in Nevada, it is inapplicable under the particular facts of this case.

Finally, we consider whether an escheat is triggered when, as here, a testator disinherits all of his or her heirs. We conclude that an escheat is triggered in such a circumstance because, when all heirs have been disinherited, the testator ''leaves no surviving spouse or kindred'' under NRS 134.120 pursuant to the plain and commonly understood meaning of that phrase. Accordingly, the district court erred in determining that the testator's estate does not escheat.

Because the disinheritance clause contained in the testator's will is enforceable, we reverse the judgment of the district court. As the testator disinherited all of his heirs, his estate must escheat.

## FACTS AND PROCEDURAL HISTORY

### The 1975 will

In 1975, William Melton executed a formal will. The will was comprised of two forms, which Melton and three witnesses signed. Melton devised most of his estate to his parents and devised small portions to his brother and two of his cousins, Terry Melton and Jerry Melton. He also indicated that his daughter was to receive nothing. In 1979, Melton executed a handwritten codicil on the back of one of the 1975 will forms that provided his friend, Alberta (Susie) Kelleher, should receive a small portion of his estate (both will forms and the codicil are hereinafter referred to as ''the 1975 will'').

### The 1995 letter

In 1995, Melton sent a handwritten letter to Kelleher. It reads:

5-15-95

5:00 AM

Dear Susie

I am on the way home from Mom's funeral. Mom died from an auto accident so I thought I had better leave something in writing so that you Alberta Kelleher will receive my

*entire estate.* I *do not* want my brother Larry J. Melton or Vicki Palm or any of my other relatives to have *one penny* of my estate. I plan on making a revocable trust at a later date. I think it is the 15 of [M]ay, no calendar, I think it[']s 5:00 AM could be 7:AM in the City of Clinton Oklahoma

Lots of Love

Bill

/s/ William E. Melton
AKA Bill Melton
[Social security number]

*Discovery of the 1975 will and the 1995 letter*

Kelleher died in 2002, thus predeceasing Melton, who died in 2008.[1] Shortly after Melton's death, respondent John Cahill, Clark County Public Administrator,[2] initiated a special administration of Melton's estate. During this administration, it was discovered that Melton had a daughter, respondent Vicki Palm. The 1995 letter was also discovered. Initially, Palm and respondent Elizabeth Stessel[3] were appointed co-administrators of Melton's estate. But the district court suspended their powers after determining that a disinterested party should administer the estate because a dispute over the proper distribution of the estate had arisen between Melton's half sisters, appellants Linda Melton Orte and Sherry L. Melton Briner, appellant State of Nevada, respondents Bryan Melton and Robert Melton,[4] and Palm. The district court therefore appointed Cahill to be the special administrator of Melton's estate. Thereafter, Cahill obtained access to Melton's safe deposit box and discovered the 1975 will. The appraised net value of Melton's estate is approximately $3 million.

---

[1]As evinced by Melton's references to his mother's funeral in the 1995 letter, his mother died sometime in 1995. It is not clear from the record when Melton's father died, but the parties agree that he predeceased Melton.

[2]Cahill is listed as a party in this appeal, but he has submitted a short brief explaining that he has no interest in this appeal.

[3]Because Palm is not a Nevada resident, she associated with Stessel, who is a Nevada resident, to co-administer the estate. *See* NRS 139.010(4)(a) (explaining that a nonresident cannot administer an estate unless he or she associates with a resident). Stessel is listed as a party in this appeal, but she has not submitted a brief and does not appear to have an interest in this appeal.

[4]Bryan is the son of Terry Melton and Robert is the son of Jerry Melton. During the proceedings below, Bryan and Robert asserted that they had an interest in the estate because Terry and Jerry were named as devisees under the 1975 will and were Melton's cousins. Bryan and Robert are listed as parties in this appeal, but they have not submitted briefs and do not appear to have an interest in this appeal.

.

## The parties and their respective positions

### Melton's daughter

Palm, Melton's only known child, initially argued that the 1995 letter is not a valid will, and that Melton's estate therefore should pass to her under the statutes governing intestate succession. Following the discovery of the 1975 will, however, she argued that the 1995 letter is a valid will and that it revoked the 1975 will. Palm argued that although the 1995 letter is a valid will, it is ineffective because the only named devisee, Kelleher, predeceased Melton. Thus, she maintained that Melton's estate should pass through intestacy, under which she has priority pursuant to NRS 134.100.[5]

### Melton's half sisters

In the proceedings below, Melton's half sisters contended that the 1995 letter is not a valid will, and therefore, the 1975 will is still effective. In addition, they argued that if the 1995 letter is a valid will, it does not effectively revoke the 1975 will. They further argued that, even assuming that the 1995 letter is a valid will that revoked the 1975 will, the revocation should be disregarded under the doctrine of dependent relative revocation. Although Melton's half sisters were not named as devisees in the 1975 will, they asserted that under Nevada's antilapse statute, NRS 133.200,[6] they could take their parent's share of Melton's estate.

### The State

The State asserted that the 1995 letter is a valid will that revoked the 1975 will. It argued that the Legislature's revisions to the Nevada Probate Code in 1999 provide for the enforcement of disinheritance clauses, even when an estate passes by intestate succession. Thus, the State contended that because Melton expressly disinherited all of his relatives in the 1995 letter, his estate must escheat.

---

[5]NRS 134.100 provides, in pertinent part: ''If the decedent leaves no surviving spouse, but there is a child . . . the estate goes to the child . . . .''

[6]The version of NRS 133.200 in effect when Melton died provided:

When any estate is devised to any child or other relation of the testator, and the devisee dies before the testator, leaving lineal descendants, those descendants, in the absence of a provision in the will to the contrary, take the estate so given by the will in the same manner as the devisee would have done if the devisee had survived the testator.

We note that the Legislature amended NRS 133.200 in 2011. 2011 Nev. Stat., ch. 270, § 71, at 1435. However, these amendments do not affect our analysis in this matter.

*The district court order*

After extensive briefing by the parties, the district court determined as follows: (1) the 1995 letter is a valid will; (2) although the 1995 letter is a valid will, the disinheritance clause contained therein is unenforceable; (3) the 1995 letter revoked the 1975 will; (4) the revocation of the 1975 will cannot be disregarded under the doctrine of dependent relative revocation because NRS 133.130 precludes the doctrine in Nevada; and (5) even if the doctrine of dependent relative revocation applies in Nevada, the doctrine is not applicable under the particular facts presented in this case. Accordingly, the district court distributed Melton's estate to Palm pursuant to the intestate succession scheme. Melton's half sisters and the State each appealed.

## DISCUSSION

On appeal, the parties largely maintain the positions that they asserted during the proceedings below. Thus, in their appeal, Melton's half sisters' primary contention is that the district court erred in determining that the 1975 will does not control the distribution of Melton's estate. In its appeal, the State's main contention is that the district court erred in deeming Melton's disinheritance clause unenforceable and in determining that his estate does not escheat.

The parties' positions compel us to resolve a sequence of issues. First, we must consider whether the 1995 letter is a valid will, and if so, whether the disinheritance clause contained therein is enforceable. We conclude that the 1995 letter is a valid will and that the disinheritance clause contained therein is enforceable under NRS 132.370. Next, we address whether the 1995 letter revoked the 1975 will. Answering this question in the affirmative, we next consider whether to adopt the doctrine of dependent relative revocation in Nevada and whether the doctrine can be applied to render the revocation of the 1975 will ineffective. Because the doctrine of dependent relative revocation promotes the sound policy of effectuating a testator's intent as closely as possible, we take this opportunity to expressly adopt the doctrine. We conclude, however, that the doctrine cannot be applied under the particular facts of this case. Finally, we turn to the proper distribution of Melton's estate under the terms of the 1995 letter. We conclude that because Melton disinherited all of his heirs, his estate must escheat to the State pursuant to NRS 134.120. Accordingly, we reverse the judgment of the district court.

*Standard of review*

Whether a handwritten document is a valid will is a question of law reviewed de novo. *Randall v. Salvation Army*, 100 Nev. 466,

470, 686 P.2d 241, 243 (1984). Similarly, ''questions of statutory construction, including the meaning and scope of a statute, are questions of law, which [we] review[ ] de novo.'' *City of Reno v. Reno Gazette-Journal*, 119 Nev. 55, 58, 63 P.3d 1147, 1148 (2003). Further, the interpretation of a will is typically subject to our plenary review. *Matter of Estate of Meredith*, 105 Nev. 689, 691, 782 P.2d 1313, 1315 (1989). Lastly, whether a will has been revoked is also generally a question of law reviewed de novo. *Estate of Anderson*, 65 Cal. Rptr. 2d 307, 311 (Ct. App. 1997).

''When a statute is clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of construction.'' *Cromer v. Wilson*, 126 Nev. 106, 109, 225 P.3d 788, 790 (2010). As we have explained, we ''must give [a statute's] terms their plain meaning, considering its provisions as a whole so as to read them in a way that would not render words or phrases superfluous or make a provision nugatory.'' *Southern Nev. Homebuilders v. Clark County*, 121 Nev. 446, 449, 117 P.3d 171, 173 (2005) (internal quotation omitted). We also have explained that a statute's express definitions are controlling because ''[t]o read [them] otherwise would lead to the absurd result of rendering [such provisions] . . . mere surplusage.'' *Boulder Oaks Cmty. Ass'n v. B & J Andrews*, 125 Nev. 397, 406, 215 P.3d 27, 32-33 (2009).

### *The 1995 letter is a valid will*

Melton's half sisters assert that the 1995 letter is simply a letter and nothing more. They emphasize that the 1995 letter was discovered amongst miscellaneous papers in Melton's home, in contrast to the 1975 will, which was found carefully placed in a safe. Thus, Melton's half sisters argue that if Melton intended for the 1995 letter to be his will, he would have treated it as carefully as the 1975 will. Therefore, they contend that because the 1995 letter is not a valid will, the 1975 will still controls the distribution of Melton's estate.

Nevada law gives holographic wills the same effect as formally executed wills. NRS 133.090(3). ''A holographic will is a will in which the signature, date and material provisions are written by the hand of the testator, whether or not it is witnessed or notarized.'' NRS 133.090(1).

The 1995 letter was written, signed, and dated by Melton. It contains the material provisions of a will because it provided that Kelleher should receive Melton's estate and that his relatives should receive nothing. Although Melton did not store the 1995 letter in the same manner that he stored the 1975 will, its valid-

ity as a holographic will does not depend upon him doing so. Melton's testamentary intent is evinced by his references to his mother's funeral, her untimely death, and his statement that he "had better leave something in writing." Accordingly, we conclude that the 1995 letter is a valid holographic will.

### The disinheritance clause contained in the 1995 letter is enforceable

Having concluded that the 1995 letter is a valid holographic will, we now consider the State's contention that the district court erred in applying the prevailing common law rule regarding disinheritance clauses and thereby deeming the disinheritance clause unenforceable. We begin our analysis of this contention by providing a background on the common law disinheritance rules, the criticisms thereof, and the modern treatment of disinheritance provisions. Next, we consider the parties' specific arguments regarding whether NRS 132.370 reverses the common law disinheritance rules in Nevada.

#### Background on disinheritance clauses

Under the common law, two general rules, known as the "English rule" and the "American rule," have been developed by courts considering whether to enforce disinheritance provisions as to property passing by intestate succession. *See* J. Andrew Heaton, Comment, *The Intestate Claims of Heirs Excluded by Will: Should "Negative Wills" Be Enforced?*, 52 U. Chi. L. Rev. 177, 179-83 (1985). Under the English rule, a disinheritance provision, or a so-called "negative will" was enforceable only if "the testator clearly expressed an intent to limit an heir to the devise (if any) contained in the will, and at least one other heir remained eligible to receive the intestate property." *Id.* at 180. Under the American rule, a testator could "prevent an heir from receiving his share of any property that passes by intestacy only by affirmatively disposing of the entire estate through a will." *Id.*

As its name suggests, the majority of jurisdictions subscribe to the American rule. *See, e.g., In re Barnes' Estate*, 407 P.2d 656, 659 (Cal. 1965) ("It is settled that a disinheritance clause, no matter how broadly or strongly phrased, operates only to prevent a claimant from taking under the will itself, or to obviate a claim of pretermission. Such a clause does not and cannot operate to prevent the heirs at law from taking under the statutory rules of inheritance when the decedent has died intestate as to any or all of his property."); 4 William J. Bowe and Douglas H. Parker, *Page on the Law of Wills* § 30.17, at 148 (rev. ed. 2004) ("If testator

does not dispose of the whole of his estate by his last will and testament, and such will contains negative words of exclusion, the great majority of states hold that such negative words cannot prevent property from passing under the statutes of descent and distribution.'').

Courts following the American rule have espoused three rationales for doing so: (1) enforcing disinheritance provisions as to intestate property ''would create an undesirable 'mixing' of the probate and intestacy systems by requiring courts to alter the distribution scheme provided in the intestacy statute''; (2) because disinheritance clauses do not expressly name devisees, ''their enforcement would in effect require courts to draft new wills for testators''; and (3) disinheritance clauses are simply ''inconsistent with the law of succession.'' Heaton, *supra*, at 186.

The common law disinheritance rules, and the rationales underpinning them, have been the subjects of intense criticism. *See, e.g.*, Frederic S. Schwartz, *Models of the Will and Negative Disinheritance*, 48 Mercer L. Rev. 1137, 1140, 1167 (1997) (stating that the justifications given for the common law rules are ''obviously circular'' and unsatisfactory, and urging courts ''to give straightforward effect'' to disinheritance provisions); Heaton, *supra*, at 184, 186 (noting that none of the rationales for the American rule ''withstand[ ] analysis,'' and concluding that it defeats testators' intentions).

Not surprisingly, because the common law disinheritance rules distort testamentary intent and conflict with testamentary freedom, the modern trend is to reject the traditional rules. The Uniform Probate Code (UPC) reflects this trend, providing that ''[a] decedent by will may expressly exclude or limit the right of an individual or class to succeed to property of the decedent passing by intestate succession.'' Unif. Probate Code § 2-101(b), 8/I U.L.A. 79 (1998). The drafters of the UPC stated that in enacting this provision, they abrogated ''the usually accepted common-law rule, which defeats a testator's intent for no sufficient reason.'' *Id.* § 2-101 cmt. The Restatement (Third) of Property also rejects the common law disinheritance rules, providing that ''[a] decedent's will may expressly exclude or limit the right of an individual or class to succeed to property of the decedent passing by intestate succession.'' Restatement (Third) of Prop.: Wills and Other Donative Transfers § 2.7 (1999). As with the UPC, the Restatement explains that this provision ''reverses the common-law rule, which defeats a testator's intent for no sufficient reason.'' *Id.* § 2.7 cmt. a. With the foregoing in mind, we turn to whether the Legislature intended for NRS 132.370 to abolish the common law disinheritance rules.

*NRS 132.370 abolishes the common law disinheritance rules*

The State asserts that by revising the Nevada Probate Code in 1999 to provide that a "will" includes a "testamentary instrument that merely . . . . excludes or limits the right of an individual or class to succeed to property of the decedent passing by intestate succession," the Legislature has rejected both the English and American rules. Thus, the State argues that disinheritance provisions are now enforceable as to property passing by intestate succession. The State acknowledges that Nevada has not adopted the UPC, but it points out the similarity in the language of NRS 132.370 and UPC section 2-101.

Palm contends that the "definition sections of Nevada's Probate Code should not be given substantive effect"[7] and claims that giving effect to disinheritance provisions would make estate planning unpredictable. In essence, she believes that the language that the Legislature used in NRS 132.370 was imprecise and unwise. Thus, Palm asserts that we should apply the common law disinheritance rules, which would render Melton's disinheritance clause unenforceable. Palm argues that because Melton's disinheritance clause is unenforceable, the district court correctly determined that she should receive Melton's estate, as she has priority under the intestate succession scheme.

NRS 132.370 defines "will" as follows:

> "Will" means a formal document that provides for the distribution of the property of a decedent upon the death of the decedent. The term includes a codicil and a testamentary instrument that *merely* appoints an executor, revokes or revises another will, nominates a guardian, *or expressly excludes or limits the right of an individual or class to succeed to property of the decedent passing by intestate succession.*

(Emphases added.)

The interpretation of NRS 132.370 is a matter of first impression for this court. NRS 132.370 defines a "will" broadly. In stark contrast to the common law disinheritance rules, NRS 132.370 imposes no requirement that an instrument affirmatively devise property in order to be enforceable. Rather, a will includes

---

[7]Palm cites *In re McKay's Estate*, 43 Nev. 114, 184 P. 305 (1919), for this proposition. *McKay's Estate* is an unremarkable case that merely indicated that a general definition could not be "carried into" a specific provision relating to rights of representation; it did not hold that definitions are not to be given effect. *Id.* at 127, 184 P. at 308-09. Moreover, even if *McKay's Estate* were to stand for the proposition that Palm attaches to it, such a proposition does not comport with this court's more recent caselaw discouraging statutory interpretation that renders terms nugatory. *See Southern Nev. Homebuilders v. Clark County*, 121 Nev. 446, 449, 117 P.3d 171, 173 (2005).

an instrument that "merely" limits an individual or class from inheriting. The plain language of NRS 132.370 thus demonstrates that the Legislature envisioned a probate system in which disinheritance provisions can be enforced as to intestate property.[8] Though Palm considers NRS 132.370 unwise, under well-established canons of statutory interpretation, we must not render it nugatory or a mere surplusage. *See Boulder Oaks Cmty. Ass'n v. B & J Andrews*, 125 Nev. 397, 406, 215 P.3d 27, 32-33 (2009); *Southern Nev. Homebuilders v. Clark County*, 121 Nev. 446, 449, 117 P.3d 171, 173 (2005).

The significance of NRS 132.370 cannot be overstated. While the Legislature's amendments to the probate code in 1999 are not a wholesale adoption of the UPC, the language of NRS 132.370 mirrors that of UPC section 2-101, which, as previously noted, was designed to abrogate the common law disinheritance rules. Giving effect to disinheritance provisions, however, is not so radical that it creates the estate planning upheaval that Palm claims it would. As UPC states such as Arizona, Colorado, and North Dakota demonstrate, such provisions can be seamlessly incorporated into the existing probate system. *See, e.g.*, *Matter of Estate of Krokowsky*, 896 P.2d 247, 249 n.2 (Ariz. 1995); *In re Estate of Walter*, 97 P.3d 188, 192 (Colo. Ct. App. 2003); *In re Estate of Samuelson*, 757 N.W.2d 44, 47 (N.D. 2008).[9]

In addition, we find the approach taken by New York courts instructive. New York, like Nevada, has not adopted the UPC, but it has enacted a statute defining a "will," in relevant part, as "an oral declaration or written instrument . . . whereby a person disposes of property or directs how it shall not be disposed of . . . ." N.Y. Est. Powers & Trusts Law § 1-2.19(a) (McKinney 1998).

---

[8]Because NRS 132.370 is unambiguous, resort to the legislative history behind its enactment is unnecessary. It should be noted, however, that the Legislature identified "eliminating unnecessary technicalities that defeat the intentions of the person making a will" as a "main element[ ]" of its revisions to the probate code. A.B. 400, Bill Summary, 70th Leg. (Nev. 1999).

[9]Palm recognizes these decisions, but asks that we instead follow *Matter of Estate of Jetter*, where, in a 3-2 decision, the Supreme Court of South Dakota decided that a disinheritance clause executed under circumstances similar to this case was unenforceable, despite South Dakota's adoption of the UPC. 570 N.W.2d 26, 30 (S.D. 1997). The *Jetter* majority's decision has been criticized as unsound and unpersuasive; we agree with these assessments and therefore decline to follow *Jetter*. *See* Julia M. Melius, Note, *Was South Dakota Deprived of $3.2 Million? Intestacy, Escheat, and the Statutory Power to Disinherit in the Estate of Jetter*, 44 S.D. L. Rev. 49, 75, 78, 82 (1999) (meticulously analyzing *Jetter* and concluding that it "directly contradicts the plain language of the [South Dakota disinheritance] statute and constitutes judicial legislation, . . . is hostile to the doctrine of testamentary freedom," "disregarded sound precedent," and is "a result-oriented decision to prevent an escheat"); *see also* Restatement (Third) of Prop.: Wills and Other Donative Transfers § 2.7 reporter's note 2 (1999) (stating that the result in *Jetter* is "[u]nfortunate[ ]").

New York courts have interpreted this definition to be a reversal of the common law disinheritance rules:

> Prior to September 1, 1967, the effective date of [the statute defining "will"], the cases held that: "The legal rights of the heir or distributee to the property of deceased persons, cannot be defeated except by a valid devise or bequest of such property to other persons" . . . .
>
> However, in this Court's opinion the new statute is unmistakable in providing that a testator now may disinherit an heir from all his property, both testamentary and intestate assets.

*In re Will of Beu*, 333 N.Y.S.2d 858, 859 (Surr. Ct. 1972) (citation omitted) (quoting *In re Hefner's Will*, 122 N.Y.S.2d 252, 254 (Surr. Ct. 1953)), *aff'd*, 354 N.Y.S.2d 600 (App. Div. 1974); *see also Matter of Will of Stoffel*, 427 N.Y.S.2d 720, 721 (Surr. Ct. 1980) ("The definition of 'will' changed the rule previously existing which made directions to disinherit someone ineffective unless all of the Decedent's assets were effectively disposed to others."), *aff'd*, 437 N.Y.S.2d 922 (App. Div. 1980). In short, we conclude that in enacting NRS 132.370, the Nevada Legislature, like the New York Legislature, abolished the common law disinheritance rules.

Here, Melton drafted a will in which he expressly excluded all of his heirs: "I *do not* want my brother Larry J. Melton or Vicki Palm or any of my other relatives to have *one penny* of my estate." Melton's intent to disinherit his heirs could not have been clearer. *See Matter of Estate of Meredith*, 105 Nev. 689, 691, 782 P.2d 1313, 1315 (1989) ("[T]he surest way . . . to carry out a testator's intent is to construe a will according to the plain meaning of the terms used in the will."). Although Palm speculates that Melton only intended to exclude her if his estate passed through his will, he placed no qualifications on his disinheritance clause. Without such direction from Melton, it cannot be said that he meant to disinherit Palm if his estate passed through his will but that he would have been content to have her receive his estate if it passed through intestate succession. *See Estate of Samuelson*, 757 N.W.2d at 48 ("[W]hen a testator expressly excludes an individual in his will, the individual is excluded from taking under both testate and intestate succession, unless the testator expressly specifies a contrary intention."). Pursuant to NRS 132.370, simply because Kelleher predeceased Melton, thereby causing his devise to her to lapse, does not render the remainder of the will, including its disinheri-

tance clause, unenforceable. Accordingly, we conclude that the disinheritance clause contained in the 1995 letter is enforceable.

## The 1995 letter revoked the 1975 will by implication

Melton's half sisters contend that even if the 1995 letter is a valid and enforceable will, it did not revoke the 1975 will. Specifically, they assert that the 1995 letter did not expressly revoke the 1975 will or otherwise effectuate a revocation in the manner required by NRS 133.120(1).

NRS 133.120(1)(b) provides that a written will may be revoked by "[a]nother will or codicil in writing, executed as prescribed in this chapter." This court has made clear that "[r]evocation of a former will is presumed where a second will is executed." *Shephard v. Gebo*, 77 Nev. 226, 231, 361 P.2d 537, 540 (1961). In other words, a will may be impliedly revoked by a subsequent will.

Under the doctrine of revocation by implication, "[a] will may be impliedly revoked by the execution of a later will containing inconsistent or repugnant provisions, although such later will contains no express clause of revocation." 95 C.J.S. *Wills* § 422 (2011) (footnotes omitted). Revocation by implication is not favored. *In re Arnold's Estate*, 60 Nev. 376, 380, 110 P.2d 204, 206 (1941); 95 C.J.S. *Wills* § 422 (2011). Nonetheless, a revocation must be implied when "there is such a plain inconsistency as makes it impossible for the wills to stand together." 95 C.J.S. *Wills* § 422 (2011). Thus, "a later will which affects the same property as an earlier will or disposes of the entire estate, leaving nothing on which the former will can operate, is generally regarded as a revocation thereof, even in the absence of express words of revocation." *Id.* (footnotes omitted).

In the 1975 will, Melton devised most of his estate to his parents and devised small portions to his brother, other relatives, and Kelleher. In the 1995 letter, Melton devised his entire estate to Kelleher. Thus, both instruments attempted to affect the same property. Because Melton attempted to devise all of his estate in the 1995 letter, no property was left upon which the 1975 will could operate. Consequently, the provisions of the two wills are so inconsistent that they cannot stand together. We therefore conclude that the 1995 letter revoked the 1975 will by implication, unless the doctrine of dependent relative revocation applies to undo this revocation, which we consider next.

*The doctrine of dependent relative revocation applies in Nevada but does not apply under the particular facts of this case*

Melton's half sisters contend that the district court erred in determining that the doctrine of dependent relative revocation does not apply under Nevada law. In particular, they argue that the court erred in determining that NRS 133.130 precludes the doctrine. Melton's half sisters further argue that the doctrine should be applied here because if Melton had known that his devise to Kelleher would lapse, it stands to reason that he would have preferred the 1975 will to control the distribution of his estate.

Dependent relative revocation is "[a] common-law doctrine that operates to undo an otherwise sufficient revocation of a will when there is evidence that the testator's revocation was conditional rather than absolute." *Black's Law Dictionary* 503 (9th ed. 2009). Although this court has, in passing, acknowledged the doctrine of dependent relative revocation, *Shephard*, 77 Nev. at 232, 361 P.2d at 540, it has never expressly adopted the doctrine.

The Restatement (Third) of Property distills the doctrine's general application as follows:

> (a) A partial or complete revocation of a will is presumptively ineffective if the testator made the revocation:
>
> (1) in connection with an attempt to achieve a dispositive objective that fails under applicable law, or
>
> (2) because of a false assumption of law, or because of a false belief about an objective fact, that is either recited in the revoking instrument or established by clear and convincing evidence.
>
> (b) The presumption established in subsection (a) is rebutted if allowing the revocation to remain in effect would be more consistent with the testator's probable intention.

Restatement (Third) of Prop.: Wills and Other Donative Transfers § 4.3 (1999).

Consistent with its purpose, "[t]he doctrine can only apply where there is a clear intent of the testator that the revocation of the old will is made conditional on the validity of the new one." 95 C.J.S. *Wills* § 412 (2011). "Evidence of this intent cannot be left to speculation, supposition, conjecture or possibility." *Matter of Estate of Patten*, 587 P.2d 1307, 1309 (Mont. 1978). Another noteworthy limitation on the doctrine is that it generally cannot be applied unless the two instruments reflect a very similar dispositive scheme. *See, e.g., Kroll v. Nehmer*, 705 A.2d 716, 722-23 (Md. 1998) ("[C]ourts have generally refused to apply the doctrine unless the two instruments reflect a common dispositive scheme."); *Hauck v. Seright*, 964 P.2d 749, 754 (Mont. 1998) ("For the doc-

trine to apply, the new will must not have changed the testamentary purpose of the old will and must essentially repeat the same dispositive plans.''). The reason for this rule is simple: A substantial disparity in the terms of the two instruments reflects the testator's disfavor of the original will, and thus, in such a case, it cannot intelligently be concluded that the testator would have preferred for the original will to control the distribution of his or her estate in the event that the subsequent will proves ineffective. *See Kroll*, 705 A.2d at 723. In sum, ''[t]he doctrine is applied with caution,'' and ''while [it] may be widely recognized, it is narrowly applied.'' *Patten*, 587 P.2d at 1309.

As indicated above, when responsibly applied, the doctrine promotes the general policy of giving effect to a testator's intent. *See* 79 Am. Jur. 2d *Wills* § 529 (2002). Jurisdictions that have adopted the doctrine recognize that it ''is simply one means of implementing [the] paramount rule'' of enforcing a testator's intent as nearly as possible. *Estate of Anderson*, 65 Cal. Rptr. 2d 307, 313 (Ct. App. 1997). This policy is sound and coincides with the long-standing objective of this court to give effect to a testator's intentions to the greatest extent possible. *See Zirovcic v. Kordic*, 101 Nev. 740, 741, 709 P.2d 1022, 1023 (1985) (''[I]t is the long-accepted position of this court that the 'primary aim in construing the terms of a testamentary document must be to give effect, to the extent consistent with law and policy, to the intentions of the testator.' '' (quoting *Concannon v. Winship*, 94 Nev. 432, 434, 581 P.2d 11, 13 (1978))). We therefore expressly adopt the doctrine of dependent relative revocation.

In so doing, we reject the notion that NRS 133.130 precludes the doctrine under Nevada law.

NRS 133.130 provides:

> If, after the making of any will, the testator executes a second will, the destruction, cancellation or revocation of the second will does not *revive* the first will, unless it appears by the terms of the revocation that it was the intention to revive and give effect to the first will, or unless, after the destruction, cancellation or revocation, the first will is reexecuted.

(Emphasis added.)

As we have explained, the effect of NRS 133.130 is that ''[o]nce a will or gift therein is revoked it cannot be revived except by re-publication or re-execution.'' *Shephard*, 77 Nev. at 231, 361 P.2d at 540. Indeed, by its plain language, NRS 133.130 restricts revival. The statute does not, however, constrain the circumstances in which a revocation may be deemed ineffective. This is a crucial

distinction because a vital precept of the doctrine of dependent relative revocation is that it does not revive a revoked will; rather, it renders a revocation ineffective. Restatement (Third) of Prop.: Wills and Other Donative Transfers § 4.3 cmt. a (1999). As the Restatement explains:

> The doctrine of ineffective revocation[10] is to be distinguished from revival of a formerly revoked will . . . . Under the revival doctrine, an effectively revoked will is rendered valid and effective because it has been reinstated by subsequent conduct showing an intent to revive it, not because the revocation was ineffective.

*Id.*

Therefore, because anti-revival statutes restrict the fundamentally distinct doctrine of revival, they should not be interpreted to preclude the doctrine of dependent relative revocation. *See In re Nutting's Estate*, 82 F. Supp. 689, 691 (D.D.C. 1949) (explaining that a statute relating to revival "has no bearing" on the issue of whether dependent relative revocation applies); *Larrick v. Larrick*, 607 S.W.2d 92, 96 (Ark. Ct. App. 1980) (Newbern, J., concurring) (explaining that an anti-revival statute does not preclude the doctrine of dependent relative revocation because "the [anti-revival] statute only comes into effect if there has been a 'revocation' [and] [i]t is to determine precisely that question, *i.e.*, whether there has been a revocation, that the doctrine is applied"); *see also* Restatement (Third) of Prop.: Wills and Other Donative Transfers § 4.3 reporter's note 1 (1999) (criticizing courts that have interpreted anti-revival statutes as precluding the doctrine of dependent relative revocation). We therefore conclude that NRS 133.130 does not preclude the doctrine of dependent relative revocation.

Nonetheless, the doctrine does not apply under the facts of this case. This is evident because the objective of the 1995 letter did not fail. The disinheritance clause contained therein is enforceable and applies to Melton's half sisters independent of the lapsed devise to Kelleher. Moreover, there is no clear evidence that the disinheritance clause was conditioned upon Kelleher receiving the estate. Thus, there is no basis for the contention that Melton would not want the 1975 will to be revoked had he known that Kelleher would predecease him. And, even if it could be said that the objective of the 1995 letter failed, the provisions of the 1975 will and the 1995 letter are completely different, which rebuts any claim

---

[10]Because the doctrine of dependent relative revocation renders a revocation presumptively ineffective in certain circumstances, the Restatement refers to the doctrine as "the *doctrine of ineffective revocation.*" Restatement (Third) of Prop.: Wills and Other Donative Transfers § 4.3 cmt. a (1999).

that Melton would have wished for the revocation of the 1975 will to be disregarded. *See Kroll,* 705 A.2d at 723 (declining to apply the doctrine where a comparison of the two wills revealed "two very different dispositive schemes," and "[t]he effect of applying the doctrine and disregarding [the testator's] revocation . . . is precisely to do what she clearly did not want done—to leave her estate to people she had intended to disinherit"). Accordingly, we conclude that the doctrine of dependent relative revocation does not apply under the particular facts of this case.

*The proper distribution of Melton's estate under the 1995 letter is an escheat*

We now turn to the proper distribution of Melton's estate under the terms of the 1995 letter. The State argues that because Melton disinherited all of his heirs in the 1995 letter, an escheat is triggered.

Palm asserts that the requisites of an escheat have not been met because, under NRS 134.120, an intestate estate can escheat only when "the decedent leaves no surviving spouse or kindred." Thus, she contends that because she survived Melton in the literal sense, his estate cannot escheat. Palm also argues that the law abhors escheats, and therefore, as a matter of public policy, an escheat should not be permitted.

Although the 1995 letter contains a disinheritance clause, and is therefore an enforceable testamentary instrument under NRS 132.370, Melton's estate nonetheless must descend through intestacy because he was unsuccessful at affirmatively distributing his estate. *See* NRS 132.195 (an " '[i]ntestate estate' includes an estate where no will has been offered or admitted to probate as the last will and testament and an estate where the will does not distribute the entire estate").[11] While this causes a "mixing" of the testate and intestate systems that was discouraged under the common law, the Legislature expressly contemplated this result. *See*

---

[11]Palm contends that resorting to NRS 132.195 creates a contradiction with NRS 132.190, which provides that " '[i]ntestate,' used as a noun, means a decedent who dies without leaving a will." Thus, she asserts that even if the 1995 letter is an enforceable will, then Melton did not die "intestate" under NRS 132.190, and therefore, his estate falls outside of the intestate succession scheme. In other words, Palm argues that if Melton's disinheritance clause is enforceable, his estate falls into a void where no direction as to the distribution of his estate can be gleaned from his will or from a statutory source and, in essence, Melton's will has to be drafted for him, which, of course, courts are loath to do. Palm's argument creates unnecessary confusion. Because the specific definition of "intestate estate" in NRS 132.195 matches the precise situation presented here, it controls. *See Lader v. Warden,* 121 Nev. 682, 687, 120 P.3d 1164, 1167 (2005) ("[W]hen a specific statute is in conflict with a general one, the specific statute will take precedence.").

NRS 132.370 (a " 'will' " includes an instrument that excludes an heir from receiving property "passing by intestate succession").

Next, NRS 134.120, the provision that sets forth the requisites for the escheat of an intestate estate, provides: "If the decedent leaves no surviving spouse or kindred, the estate escheats to the State for educational purposes." We reject Palm's cramped interpretation of this provision because it is commonly understood that when a disinheritance clause is enforceable as to intestate property, a disinherited heir is treated, as a matter of law, to have predeceased the testator. *See In re Will of Beu*, 333 N.Y.S.2d 858, 861 (Surr. Ct. 1972) (a disinherited heir is "considered to have predeceased the testator" under the New York statute providing for the enforcement of disinheritance clauses as to intestate property); Frederic S. Schwartz, *Models of the Will and Negative Disinheritance*, 48 Mercer L. Rev. 1137, 1145 (1997) ("A provision disinheriting [an heir] should result in an application of the intestacy statute as if [that heir] predeceased the testator."); J. Andrew Heaton, Comment, *The Intestate Claims of Heirs Excluded by Will: Should "Negative Wills" Be Enforced?*, 52 U. Chi. L. Rev. 177, 192 (1985) (when a disinheritance clause is enforced as to intestate property "the excluded heir is treated as having predeceased the testator").[12]

Thus, because we presume that the Legislature was aware of the commonly understood effect of the language of NRS 134.120 when it drafted the statute, this is how it must be construed. *See Beazer Homes Nevada, Inc. v. Dist. Ct.*, 120 Nev. 575, 580-81, 97 P.3d 1132, 1135-36 (2004) ("When a legislature adopts language that has a particular meaning or history, rules of statutory construction . . . indicate that a court may presume that the legislature intended the language to have meaning consistent with previous interpretations of the language."). Accordingly, we conclude that when a testator disinherits all heirs, he or she "leaves no surviving spouse or kindred" for the purposes of NRS 134.120 and, as a consequence, an escheat is triggered.

The law disfavors escheats. *In re Estate of Cruz*, 264 Cal. Rptr. 492, 493 (Ct. App. 1989). The commonly cited reason for this

---

[12]Moreover, if Palm's interpretation of NRS 134.120 were credited, a testator's disinheritance of all heirs would always amount to a useless gesture, despite the Legislature's clearly expressed intent in NRS 132.370 to provide for the enforcement of disinheritance provisions. *See Universal Electric v. Labor Comm'r*, 109 Nev. 127, 131, 847 P.2d 1372, 1374 (1993) ("[T]he intent of a statute will prevail over the literal sense of its words.").

principle is that "society prefers to keep real property within the family as most broadly defined, or within the hands of those whom the deceased has designated." *United States v. 198.73 Acres of Land, More or Less*, 800 F.2d 434, 435 (4th Cir. 1986). But the law also strives to effectuate the intentions of testators. *Zirovcic v. Kordic*, 101 Nev. 740, 741, 709 P.2d 1022, 1023 (1985). It is unmistakable that in enacting NRS 132.370, the Legislature weighed these competing considerations and determined that testamentary freedom has primacy over the policy disfavoring escheats. Thus, when, as here, a testator disinherits all of his or her heirs, the law's disfavor of escheats does not prevent an estate from passing to the State. Accordingly, we conclude that Melton's estate must escheat to the State.

## *CONCLUSION*

Because the disinheritance clause contained in Melton's will is enforceable, we reverse the judgment of the district court. As Melton disinherited all of his heirs, his estate escheats.[13]

---

[13]We have considered the parties' remaining arguments and conclude that they are without merit.